**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**ARKANSAS UNITED**
**and L. MIREYA REITH**                                                                                    **PLAINTIFFS**

**V.**                              **CASE NO. 5:20-CV-5193**

**JOHN THURSTON, in his official capacity**
**as the Secretary of State of Arkansas;**
**SHARON BROOKS, BILENDA HARRIS-RITTER,**
**WILLIAM LUTHER, CHARLES ROBERTS,**
**JAMES SHARP, and J. HARMON SMITH,**
**in their official capacities as members**
**of the Arkansas State Board of Election Commissioners;**
**RENEE OELSCHLAEGER, BILL ACKERMAN,**
**MAX DEITCHLER, and JENNIFER PRICE,**
**in their official capacities as members**
**of the Washington County Election Commission;**
**RUSSELL ANZALONE, ROBBYN TUMEY,**
**and HARLAN STEE, in their official capacities as members**
**of the Benton County Election Commission;**
**DAVID DAMRON, LUIS ANDRADE, and LEE WEBB,**
**in their official capacities as members of the Sebastian**
**County Election Commission; and MEGHAN HASSLER, in**
**her official capacity as Election Coordinator for the**
**Sebastian County Election Commission**                                    **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

There are three motions currently before the Court. Defendants David Damron, Luis Andrade, Lee Webb, and Meghan Hassler filed a Motion to Dismiss and Memorandum Brief in Support (Docs. 82 & 83). Another Motion to Dismiss and Memorandum Brief in Support were filed by Defendants Russell Anzalone, Robbyn Tumey, and Harlan Stee (Docs. 84 & 85). Finally, Defendants John Thurston, Sharon Brooks, Bilenda Harris-Ritter, William Luther, Charles Roberts, James Sharp, and J. Harmon Smith filed a Motion to Dismiss or Alternatively to Stay Discovery and Certify Interlocutory Appeal and a Memorandum Brief in Support (Docs. 86 & 87). Plaintiffs filed

a Response in Opposition to each Motion (Docs. 95, 96 & 97, respectively).   For the reasons discussed below, all three Motions (Docs. 82, 84 & 86) are **DENIED**.

## I. BACKGROUND

The Plaintiffs are Arkansas United, a non-profit organization located in Springdale, Arkansas, and L. Mireya Reith, the founder and executive director of the organization. Arkansas United advocates for immigrant populations in the state through education about the voting process and by assisting those voters who are limited in their English proficiency to read, mark, and cast their ballots at polling places.   Arkansas United was founded in 2010 and is funded by hundreds of members who pay dues to support the organization's mission.   The Defendants, all of whom are sued in their official capacities, can be divided into four groups.   The first group, to which the Court will refer as the State Defendants, includes the Secretary of State of Arkansas—John Thurston—and the members of the Arkansas State Board of Election Commissioners—Sharon Brooks, Bilenda Harris-Ritter, William Luther, Charles Roberts, James Sharp, and J. Harmon Smith.   Another group is comprised of Renee Oelschlaeger, Bill Ackerman, Max Deitchler, and Jennifer Price, who are all members of the Washington County Election Commission and to whom the Court will refer as the Washington County Defendants.   The members of the Benton County Election Commission—Russell Anzalone, Robbyn Tumey, and Harlan Stee—will similarly be referred to as the Benton County Defendants.   Finally, David Damron, Luis Andrade, and Lee Webb are members of the Sebastian County Election Commission, and Meghan Hassler is the Sebastian County Election Coordinator. Together, these individuals will be referred to as the Sebastian County Defendants.

Plaintiffs first filed the original complaint in this matter and a motion for temporary restraining order on the night before Election Day in 2020.  This Court issued a Memorandum Opinion and Order finding that Plaintiffs had demonstrated a likelihood of success on the merits but nevertheless denying the motion because Election Day voting was already in progress and the balance of the equities dictated against modifying the rules by which voting was being administered halfway through the day.  *See* Doc. 35. Defendants then filed motions to dismiss, which became moot when Plaintiffs filed the operative Amended Complaint.  Benton and Sebastian County Defendants and State Defendants each filed Motions to Dismiss the Amended Complaint.

Plaintiffs seek declaratory judgment that Sections 7-5-310(b)(4)(B), 7-5-310(b)(5), 7-1-103(a)(19), and 7-1-103(b)(1) of the Arkansas Code violate the Supremacy Clause of the Constitution and are preempted by Section 208 of the Voting Rights Act ("VRA"). Plaintiffs also seek an injunction prohibiting enforcement of those state-law provisions and directing Defendants to implement a remedial plan to ensure that voters with limited English proficiency are permitted to receive assistance from an individual of their choice when voting in future elections.

Under Arkansas Code § 7-1-103(a)(19)(C) and (b)(1), a person who assists a voter "in marking and casting the voter's ballot except as provided in § 7-5-310" is potentially subject to criminal misdemeanor penalties.  While Section 7-5-310(4)(A)(i) provides that the voter may be assisted by a person of his or her choice, Section 7-5-310(b)(4)(B) adds the restriction that "[n]o person other than [poll workers] shall assist more than six (6) voters in marking and casting a ballot at an election[.]"  Section 7-5-310(b)(5) further provides that "[i]t shall be the duty of the poll workers at the polling site to make and

maintain a list of the names and addresses of all persons assisting voters."  Plaintiffs argue that this six-voter limit on assistance under Arkansas law, enforceable by criminal misdemeanor penalties, violates Section 208 of the VRA, which provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union."  52 U.S.C. § 10508.[1]

Sebastian County, Benton County, and State Defendants have each filed Motions to Dismiss the Amended Complaint.  The Sebastian and Benton County Defendants' Motions are substantively identical, and the Court will take up those Motions together before turning to the arguments made by State Defendants.

## II.  BENTON AND SEBASTIAN COUNTY DEFENDANTS' MOTIONS TO DISMISS

### A.  Service of Process is Sufficient

First, Benton and Sebastian County Defendants assert that the Amended Complaint should be dismissed for insufficient process or service of process pursuant to Rule 12(b)(4) and/or (5) of the Federal Rules of Civil Procedure.  Since the County Defendants' objection is to the service itself, not the form of process or content of the summons, the Motions are properly brought under Rule 12(b)(5) rather than Rule

---

[1]  The Court notes that Arkansas Code § 7-5-310 is titled "Privacy—Assistance to voters with disabilities" and by its plain language does not appear to apply to voters who are entitled to assistance because of their limited proficiency in English.  However, no Defendant suggests that Plaintiffs' claims are moot because the six-voter limit does not apply to Spanish-speaking voters with limited English proficiency.  Quite the opposite, in fact—State Defendants vigorously defend the constitutionality of the six-voter limit in this context.  Therefore, the Court concludes that the issue before it is in fact a live case or controversy as required by Article III of the Constitution.

12(b)(4).  "In a Rule 12(b)(5) motion, the party making the service has the burden of demonstrating validity when an objection to the service is made."  *Roberts v. USCC Payroll Corp.*, 2009 WL 88563, at *1 (N.D. Iowa Jan. 13, 2009) (internal quotation marks omitted).  Rule 4 lays out the requirements for proper service of process.  Rule 4(e)(2) provides that an individual may be served by delivering a copy of the summons and the complaint to the individual, to an appropriate person at the individual's residence, or to the individual's authorized agent.  Rule 4(m) requires that a defendant be served within ninety days after the complaint is filed or seek an extension of time from the court.

Plaintiffs initially attempted service for all Benton County Defendants by serving "Kim Denison as Election Coordinator," *see* Docs. 46–48, and for all Sebastian County Defendants by serving "Dan Shue as Prosecuting Attorney."  *See* Docs. 53–56.  Benton and Sebastian County Defendants object to this as insufficient because neither Kim Denison nor Dan Shue is an authorized agent of the various County Defendants to accept service on their behalf.  However, it appears from a review of the docket that each of the Benton and Sebastian County Defendants was subsequently served individually.  *See* Docs. 70–73 & 92–94.  None of the County Defendants make any argument challenging those proofs of service, which were all delivered within ninety days after the filing of the complaint, as required by Rule 4(m).  Therefore, the Court concludes that service of process is sufficient as to each of the Benton and Sebastian County Defendants.

## B.  The Amended Complaint Adequately States a Claim

Next, Benton and Sebastian County Defendants seek dismissal of the Amended Complaint for failure to state a claim pursuant to Rule 12(b)(6).  In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must "accept as true all facts pleaded by the

non-moving party and grant all reasonable inferences from the pleadings in favor of the nonmoving party." *Gallagher v. City of Clayton*, 699 F.3d 1013, 1016 (8th Cir. 2012) (quotation marks omitted). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). The alleged facts must be specific enough "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Pleadings that contain mere "labels and conclusions" or "a formulaic recitation of the elements of the cause of action will not do." *Id*. A court is not required to "blindly accept the legal conclusions drawn by the pleader from the facts." *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).

Benton and Sebastian County Defendants argue that they can only be liable in their official capacities for unconstitutional acts that implement a policy or custom, not for simply performing a ministerial duty pursuant to an allegedly unconstitutional state law. In response, Plaintiffs point out that the cases relied upon by Benton and Sebastian County Defendants are specific to suits brought pursuant to 42 U.S.C. § 1983 and the "policy or custom" requirement does not apply to Plaintiffs' claims under the VRA.

The Court agrees with Plaintiffs. Each of the cases cited by Benton and Sebastian County Defendants addresses municipal liability under § 1983. No aspect of any of these cases suggests that the requirements for municipal liability are applicable outside the context of § 1983. *See Does v. Wash. Cnty.*, 150 F.3d 920, 922 (8th Cir. 1998); *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 400 (1997); *Jane Doe v. Special Sch. Dist. of St. Louis Cnty.*, 901 F.2d 642 (8th Cir. 1990).

Instead, the Court finds *281 Care Committee v. Arneson*, 638 F.3d 621 (8th Cir. 2011), to be much more instructive here, where Plaintiffs seek only prospective relief from the enforcement of an allegedly unconstitutional state law.   The plaintiffs in *281 Care Committee* challenged as unconstitutional a Minnesota statute that prohibited communications about a ballot initiative that were knowingly false or communicated with reckless disregard for their falsity.   The statute was first enforceable through a civil complaint to an administrative office.   County attorneys had the discretion to decide whether to bring criminal charges once the civil process was complete.   In reversing the lower court and holding that the plaintiffs' injury was redressable and that they had standing to challenge the state law, the Eighth Circuit noted that

> [w]hen a statute is challenged as unconstitutional, the proper defendants are the officials whose role it is to administer and enforce the statute.  The county attorneys are the parties primarily responsible for enforcing the criminal portion of the statute; enjoining them would redress a discrete portion of plaintiffs' alleged injury in fact.

*Id.* at 631 (internal citation omitted).  If an injunction against the county attorneys would provide at least partial redress to the alleged injury, it stands to reason that they are appropriate defendants for such a suit.

In the Amended Complaint, Plaintiffs allege that Russell Anzalone, Robbyn Tumey, and Harlan Stee, as members of the Benton County Election Commission, and David Damron, Luis Andrade, and Lee Webb, as members of the Sebastian County Election Commission, may review the list of persons who assisted voters at polling locations in their respective counties and refer individuals to the county attorney for possible criminal prosecution.  *See* Doc. 79, ¶¶ 16 & 17.  The Amended Complaint further alleges that Meghan Hassler, as the Sebastian County Election Coordinator, "carries out election

administration duties . . . including enforcing the voter assistance provisions challenged by Plaintiffs." (Doc. 79, ¶ 18). These allegations are sufficient at this stage of litigation to make a plausible claim against each of the Benton and Sebastian County Defendants.

Finally, Benton and Sebastian County Defendants seek to adopt the substantive arguments made by State Defendants in the motion to dismiss and brief in support filed in response to the original complaint (Docs. 62 & 63). That motion was mooted by Plaintiffs' Amended Complaint, but State Defendants have renewed many of their arguments in their Motion to Dismiss the Amended Complaint (Doc. 86), which the Court will take up below.

### III. STATE DEFENDANTS' MOTION TO DISMISS

State Defendants offer many reasons why the Amended Complaint must be dismissed. All of them are without merit. First, the Court will take up State Defendants' challenges to this Court's jurisdiction under Rule 12(b)(1)—state sovereign immunity and Plaintiffs' lack of standing. Concluding that it has jurisdiction, the Court will then consider under Rule 12(b)(7) whether Plaintiffs failed to join necessary parties before turning to the challenges State Defendants make to the merits of Plaintiffs' claims under Rule 12(b)(6). Finally, the Court will address the argument that Plaintiffs' claims are barred by laches.

### A. State Defendants Are Not Immune From Suit

The Court first turns to State Defendants' assertion that state sovereign immunity bars Plaintiffs' claims. Federal courts are courts of limited jurisdiction, and Rule 12(b)(1) permits a defendant to move to dismiss claims over which the court lacks subject-matter jurisdiction. State sovereign immunity, as enshrined in the Eleventh Amendment and interpreted by the Supreme Court in *Hans v. Louisiana*, 134 U.S. 1 (1890), prevents a

federal court from hearing a suit against a state by a citizen of that state.  There are a handful of exceptions to state sovereign immunity, two of which are relevant to the instant case.  First, Congress may abrogate state sovereign immunity when it acts pursuant to its enforcement power under Section 5 of the Fourteenth Amendment and Section 2 of the Fifteenth Amendment, so long as its intention to do so is "unmistakably clear in the language of the statute." *Dellmuth v. Muth*, 491 U.S. 223, 228 (1989) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985)).  Second, the Supreme Court held in *Ex parte Young* that the Eleventh Amendment does not bar suits for prospective injunctive relief against state officials to prevent violations of federal law so long as the official has "some connection with the enforcement of that act."  209 U.S. 123, 157 (1908).

State Defendants argue that neither of these exceptions to state sovereign immunity apply in this case.  First, State Defendants urge the Court to hold that Section 208 does not protect voters with limited English proficiency.  To find otherwise, State Defendants argue, would force the Court to conclude that the provision is unconstitutional because the Fifteenth Amendment empowers Congress to pass legislation to protect voters from discrimination only on the basis of race, not proficiency in English.  Section 208 as Plaintiffs interpret it would therefore exceed the scope of Congress's enforcement power.  Second, State Defendants argue that Section 208 does not meet the standards that have emerged from the case law to validly abrogate state sovereign immunity.  They assert that there is no explicit statement of Congress's intent to abrogate sovereign immunity, that Congress failed to identify a history and pattern of discrimination against voters with limited English proficiency, and that the remedial legislation is not congruent and proportional to the identified harm.  According to State Defendants, this means that

the *Ex parte Young* exception to sovereign immunity is also inapplicable: If Section 208 cannot validly protect voters with limited English proficiency, then there is no violation of federal law for which to seek prospective relief against State Defendants.  Finally, State Defendants argue that even if the Court accepts Plaintiffs' interpretation of Section 208, sovereign immunity still bars their suit.  The *Ex parte Young* exception for officer suits does not apply, State Defendants argue, where the statute provides an alternative remedial framework, nor do the individual State Defendants have a sufficient connection with the enforcement of the six-voter limit.

Since Plaintiffs name State Defendants in their official capacity, seek only prospective injunctive relief, and do not name the State of Arkansas as a party to their suit, the Court will first consider whether the exception to sovereign immunity provided in *Ex parte Young* is applicable in this case.  Concluding that it is, the Court does not take up the issue of whether the VRA also abrogates state sovereign immunity.

### 1. Section 208 Covers Voters with Limited English Proficiency

The first question is whether Congress intended for voters with limited English proficiency to be protected by Section 208.  The Court concludes that it did.  Section 208 provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508.  The plain language of the statute encompasses voters who cannot read or write in English because of their limited English proficiency.  Nothing about the statutory text suggests that the "inability" cannot be due to a lack of education rather than a disability, or that the provision does not apply to voters who can read or

write in a language other than English.  Neither State Defendants' emphasis on the use of the term "illiterate persons" in the provision's title nor on the absence of the term "limited-English-proficient" in the statute persuades the Court to add its own gloss to the plain language of Section 208.

Nor is this a novel interpretation of Section 208.  District courts across the country have entered consent decrees between the Justice Department and municipalities that have violated Section 208 with regard to foreign-language speakers with limited proficiency in English.  *See* Consent Decree, Judgment, and Order, *United States v. Fort Bend Cnty.*, No. 4:09-cv-01058 (S.D. Tex. Apr. 13, 2009) (requiring county to allow Spanish-speaking voters with limited English proficiency to be assisted by the person of their choice pursuant to Section 208); Memorandum of Agreement, *United States v. Kane Cnty.*, No. 07 C 5451 (N.D. Ill. Nov. 7, 2007) (same); Consent Decree, Judgment, and Order, *United States v. Brazos Cnty.*, No. H-06-2165 (S.D. Tex. June 29, 2006) (same); Consent Decree, *United States v. Orange Cnty.*, No. 6:02-cv-737-ORL-22JGG (M.D. Fla. Oct. 8, 2002) (same); Settlement Agreement, *United States v. City of Philadelphia*, No. 2:06cv4592 (E.D. Pa. June 4, 2007) (requiring city to allow limited-English-proficient Spanish-speaking voters to be assisted by the person of their choice pursuant to Section 208); Revised Agreed Settlement Order, *United States v. City of Springfield*, No. 06-301-23-MAP (D. Mass. Sept. 15, 2006) (same).

Courts have also upheld challenges by individuals and organizations asserting that Section 208 extends to voters with limited English proficiency.  *See Priorities USA v. Nessel*, 462 F. Supp. 3d 792, 816 (E.D. Mich. 2020) (finding the plaintiffs adequately pleaded their claim that Section 208 preempted a state law placing additional restrictions

on who could assist a voter with limited English proficiency); *OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017) (affirming summary judgment in favor of plaintiffs who alleged Section 208 preempted a state voting law that restricted the assistance limited-English-proficient voters could receive); *Nick v. Bethel*, 2008 WL 11456134 (D. Alaska Jul. 30, 2008) (granting preliminary injunction based on a finding that plaintiffs had demonstrated a likelihood of success on their claim that the state violated Section 208 when it prevented Alaska Native Yup'ik-speaking voters from having assistance from a person of their choosing); *United States v. Berks Cnty.*, 277 F. Supp. 2d 570 (E.D. Pa. 2003) (holding that denying Spanish-speaking voters assistance by a person of their choice violated Section 208).

The legislative history also supports the Court's conclusion from the text that Congress intended for Section 208 to cover voters who spoke other languages but struggled to read and write in English.  The Senate Report discussing the addition of Section 208 to the VRA recognized that "[c]ertain discrete groups of citizens are unable to exercise their rights to vote without obtaining assistance in voting including aid within the voting booth."  S. Rep. No. 417, 97th Cong., 2d Sess. at 62.  These groups include "those who either do not have a written language or who are unable to read or write sufficiently well to understand the election material and the ballot."  *Id*.  Further underscoring that Section 208 covers voters with limited proficiency in English, the Senate Report referenced an exception to the employer limitation for "voters who must select assistance in a small community composed largely of language minorities."  *Id*. at 64. Thus, it is clear that Congress intended for Section 208 to apply to voters with limited proficiency in English.

### 2.  *Section 208 Does Not Exceed Congress's Authority*

Since the Court concludes that Congress intended Section 208 to cover voters with limited English proficiency, the next question is whether Section 208, thus interpreted, exceeds the scope of Congress's lawmaking authority.  The Court concludes that it does not.  Section 5 of the Fourteenth Amendment and Section 2 of the Fifteenth Amendment both grant Congress the authority to pass legislation to protect the rights guaranteed by those amendments.  The Supreme Court has long recognized that the VRA was enacted pursuant to Congress's authority under both the Fourteenth and Fifteenth Amendments.  *E.g.*, *United States v. Bd. of Comm'rs of Sheffield*, 435 U.S. 110, 126–27 (1978) (noting that the VRA "is designed to implement the Fifteenth Amendment and, in some respects, the Fourteenth Amendment") (citing *Katzenbach v. Morgan*, 384 U.S. 641 (1966) and *South Carolina v. Katzenbach*, 383 U.S. 301 (1966)); *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997) (". . . measures protecting voting rights are within Congress' power to enforce the Fourteenth and Fifteenth Amendments . . . .").

The Equal Protection Clause in Section 1 of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  Section 5 provides that "Congress shall have the power to enforce this article by appropriate legislation."  Despite the broad scope of the Equal Protection Clause, however, Congress's enforcement power is not without limit.  In *City of Boerne*, the Supreme Court acknowledged that "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States.'"  521 U.S. at 518 (quoting *Fitzpatrick v.*

*Bitzer*, 427 U.S. 445, 455 (1976)).  "Congress' power under § 5, however, extends only to 'enforcing' the provision of the Fourteenth Amendment.  The Court has described this power as 'remedial.'"  *Id*. at 519 (quoting *South Carolina v. Katzenbach*, 383 U.S. at 326) (modification adopted).  "Congress has been given the power 'to enforce,' not the power to determine what constitutes a constitutional violation."  *Id*.  "There must be a congruence and  proportionality  between  the  injury  to  be  prevented  or  remedied  and  the  means adopted to that end."  *Id*. at 520.  "The appropriateness of remedial measures must be considered in light of the evil presented."  *Id*. at 530.  An appropriate remedial measure must be "understood as responsive to, or designed to prevent, unconstitutional behavior." *Id*. at 532.

State Defendants argue that Section 208 exceeds Congress's power to enforce the Fifteenth Amendment.  Because Section 1 of that amendment speaks only of race and not of language ability, State Defendants argue, including voters with limited English proficiency within the scope of Section 208 exceeds Congress's power under Section 2. Further, State Defendants argue that because the legislative record for Section 208 does not identify a history and pattern of violations of the voting rights of voters with limited English proficiency, Section 208 cannot be considered a congruent and proportional remedy.  Both of these arguments miss the mark by inappropriately narrowing the scope of the Court's inquiry.

First, as noted above, the Supreme Court has held that both the Fourteenth and Fifteenth Amendments authorize legislation protecting voting rights, including the VRA. In *Katzenbach v. Morgan*, for example, the Supreme Court upheld Section 4(e) of the VRA as enacted in 1965.  Section 4(e) prohibited states from denying the right to vote to

"persons educated in American-flag schools in which the predominant classroom language was other than English" based on an inability to read or write in English.  The Supreme Court held that Section 4(e) was a valid enactment under the Enforcement Clause of the Fourteenth Amendment that preempted a New York state law that required English literacy to vote.  *Id*. at 652.  The Court agreed that Congress was within the scope of its authority under the Fourteenth Amendment when it determined that the English literacy requirement was intended to deny the right to vote to certain citizens and "constituted an invidious discrimination in violation of the Equal Protection Clause."  *Id.* at 656.  Thus, the Court concludes that even if the Fifteenth Amendment is focused on discrimination on the basis of race, the Fourteenth Amendment empowers Congress to pass legislation that prevents citizens with limited proficiency in English from being denied their right to cast a meaningful vote.

Second, the Court is persuaded that Section 208 is congruent and proportional to an identified constitutional violation and does not impermissibly expand the scope of the Equal Protection Clause.  The Court does not agree with State Defendants that it is constrained to look only at Section 208 to determine whether the "legislative record contains . . . findings of violations of the rights" of language minorities.  Read as a whole, the VRA evinces a clear concern for the voting rights of citizens with limited English proficiency.  In one section of the VRA, Congress made the finding "that voting discrimination against citizens of language minorities is pervasive and national in scope. Such minority citizens . . . have been denied equal educational opportunities by State and local governments, resulting in severe disabilities and continuing illiteracy in the English language."  52 U.S.C. § 10301(f)(1).  In another section, Congress found that "citizens of

language minorities have been effectively excluded from participation in the electoral process" and that "the denial of the right to vote of such minority group citizens is ordinarily directly related to the unequal educational opportunities afforded them resulting in high illiteracy and low voting participation." 52 U.S.C. § 10503(a).  While these findings appear in other sections of the VRA that lay out more expansive requirements for states in areas with higher concentrations of language-minority voters, the same findings support the less intrusive requirement of Section 208.  And in light of Congress's findings regarding the obstacles faced by voters with limited English proficiency, the Court finds that permitting such voters to have an assistor of their choice is a congruent and proportional remedy to enforce the guarantees of the Equal Protection Clause and does not impermissibly create a new constitutional violation not contemplated by the Fourteenth Amendment.   As the Senate Report makes clear, Section 208 "does not create a new right . . . to receive assistance; rather it implements an existing right by prescribing minimal requirements as to the manner in which voters may choose to receive assistance."  S. Rep. No. 417, 97th Cong., 2d Sess. at 63.  This was necessary to effect the nationwide prohibition of literacy tests—if a person who cannot read in English is permitted to vote, she must be permitted to have assistance at the polls or her right to vote is meaningless.  *See id.*

### 3. The VRA's Remedial Scheme does not Preclude Officer Suits

Having determined that Section 208 is a valid federal law as applied to voters with limited English proficiency, which might otherwise be enforceable through a suit against the appropriate officer, the Court now turns to State Defendants' argument that the VRA contains a "detailed enforcement mechanism" that supplants officer suits pursuant to *Ex parte Young*.  State Defendants argue that 52 U.S.C. § 10308(d), which provides for civil

action by the Attorney General to seek injunctive relief, supplants officer suits pursuant to *Ex parte Young* to enforce the VRA.  However, State Defendants ignore entirely that 52 U.S.C. § 10302 clearly contemplates "proceeding[s] instituted by . . . an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment."  This language explicitly creates a private right of action to enforce the VRA, and the Court cannot render that language meaningless when § 10302 and § 10308(d) can easily coexist.  *See Ala. State Conf. of N.A.A.C.P. v. Alabama*, 949 F.3d 647, 651 (11th Cir. 2020) ("Originally, § 3 gave enforcement authority only to the Attorney General of the United States. . . . Congress then amended § 3 in 1975 to make what was once implied now explicit: private parties can sue to enforce the VRA.").

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), does not suggest a different result.  In *Seminole Tribe*, the Supreme Court cautioned that "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*."  *Id.* at 74.  The Supreme Court emphasized "the intricate procedures set forth" by the Indian Gaming Regulatory Act ("IGRA") that "limit significantly" the state's obligations to the tribe and the potential sanctions.  *Id.*  For example, a state's refusal to negotiate with the tribe results in referral to a mediator and then to the Secretary of the Interior.  "By contrast with this modest set of sanctions, an action brought against a state official under *Ex parte Young* would expose that official to the full remedial powers of a federal court, including, presumably, contempt sanctions."  *Id.* at 75.  In conclusion, the Supreme Court observed

that if the IGRA "could be enforced in a suit under *Ex parte Young* . . . it is difficult to see why an Indian tribe would suffer through the intricate [statutory] scheme." *Id*.

Here, in contrast, the VRA clearly permits both the Attorney General or "an aggrieved person" to initiate judicial proceedings to enforce the statute's requirements.  It does not lay out alternative sanctions or procedures that would be circumvented by enforcement under *Ex parte Young*.  Nothing about permitting judicial proceedings to go forward undermines the effectiveness of any other portion of the VRA.  Thus, the Court concludes that to the extent the VRA includes other methods of enforcement, it does not supplant officer suits under *Ex parte Young*.

### 4. *State Defendants are Appropriate Parties to an Officer Suit*

Since the Court has determined that officer suits pursuant to *Ex parte Young* are an appropriate method of enforcing the VRA, the Court now takes up State Defendants' final argument: that neither the Secretary of State nor the members of the Arkansas Board of Election Commissioners are appropriate defendants in such a suit.  State Defendants argue that since they do not have the authority to commence criminal proceedings against Plaintiffs for violations of the state laws they challenge, they are made parties simply as representatives of the state, which *Ex parte Young* does not permit.  The Court disagrees.

In *281 Care Committee v. Arneson*, 638 F.3d 621 (8th Cir. 2011), the Eighth Circuit considered what kind of enforcement power an official must have to be an appropriate defendant in an officer suit and held that "[w]hile we do require 'some connection' between the [defendant official] and the challenged statute, that connection does not need to be primary authority to enforce the challenged law."  *Id*. at 632.  Here, Plaintiffs allege that the state Board of Election Commissioners "is responsible for, among other duties,

providing statewide guidance and training to election officers and county election commissioners" and that the Board "issues a manual of procedures for county election commissions as well as additional training materials for election officials." (Doc. 79, ¶ 14).[2]  Secretary Thurston is the chairperson of the Board and oversees the state Election Division.  *See id.* at ¶ 13.  In pleading that State Defendants are responsible for training the county election commissioners on their legal duties, Plaintiffs have shown a sufficient connection with the enforcement of the six-voter limit to allow them to seek relief against those officials under *Ex parte Young.*  *See also Mo. Prot. & Advoc. Servs., Inc. v. Carnahan*, 499 F.3d 803, 807 (8th Cir. 2007) (holding that the Secretary of State was an appropriate defendant for purposes of *Ex parte Young* where local election officials had "broad authority" to administer elections but the Secretary was the "chief state election official" and the record reflected "apparent confusion" among local election officials about the state laws at issue).

---

[2] The Court notes that the Arkansas Board of Election Commissioners' website, to which Plaintiffs refer in the Amended Complaint, provides answers to frequently asked questions, including the following under the heading "Voter Issues":

> Q: How is it possible to know if a person has assisted more than six (6) voters?
> A: A person may assist no more than six voters in an election. The poll workers can only ensure that a person does not assist any more than six (6) voters at that individual polling site through maintaining a list of the names and addresses of all persons assisting voters as required by law. After the election, the county election commission can review the List of Persons Assisting Voters from all the polling locations. If it is believed that a person may have assisted more than six (6) voters, the commission can submit that information and any evidence to the Prosecuting Attorney [A.C.A. § 7-5-310(b)(4)(B)]. Any violation is a Class A misdemeanor offense punishable by fine or confinement. [A.C.A. § 7-1-103(a)(20)(C)].

FAQs, Arkansas State Board of Election Commissioners, https://www.arkansas.gov/sbec/faqs/ (last accessed Jan. 31, 2021).

## B.  Plaintiffs Have Standing

Next, the Court takes up whether Plaintiffs have standing to bring their claims.  In seeking dismissal under Rule 12(b)(1), State Defendants argue that Plaintiffs lack standing for two reasons. First, State Defendants argue that Plaintiffs have not suffered an injury-in-fact because neither Plaintiff is a voter alleging she was denied protections under Section 208.  Second, State Defendants argue that Plaintiffs' alleged injury is not fairly traceable to the State Defendants because they would not be the ones to bring criminal charges for violations of Arkansas Code § 7-5-310(b)(4)(B) and therefore would not be redressed by the relief sought.  In response, Plaintiffs argue that they have pleaded sufficient facts to establish both associational and organizational standing.  Specifically, Plaintiffs claim Arkansas United has been injured by having to divert resources as a result of the unconstitutional state law and that their members have been injured because they were denied the right to vote with the help of an assistor of their choice.  These injuries, according to Plaintiffs, are both traceable to State Defendants and redressable by a favorable decision because State Defendants play a role in the implementation and enforcement of the six-voter limit.

In a multi-plaintiff suit, only one plaintiff need satisfy the constitutional standing requirements.  *See Horne v. Flores*, 557 U.S. 433, 446–47(2009).  A plaintiff organization may establish standing in two ways.  Where a plaintiff entity challenges an action that affects it directly, the court "conduct[s] the same inquiry as in the case of an individual." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982).  Thus, for organizational standing, a plaintiff entity must show that it: (1) suffered an injury-in-fact; (2) which is fairly traceable to the actions of the defendant; and (3) will likely be redressed by a favorable

decision.  *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560–61 (1992).  An injury-in-fact is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id*. at 560 (internal citations and quotation marks omitted).

"[I]n the absence of injury to itself, an association may have standing solely as the representative of its members."  *Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist.*, 813 F.3d 1124, 1128 (8th Cir. 2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). To establish associational standing, the entity must prove the following three elements: (1) its members would have standing to sue in their own right; (2) the suit seeks to protect interests germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

The Court first considers whether the pleadings support organizational standing. Concluding that they do, the Court does not take up whether Plaintiffs have also sufficiently pleaded associational standing on behalf of Arkansas United's members.

### 1.  The Facts Pleaded Allege an Injury-in-Fact

Plaintiffs have pleaded sufficient facts to establish that Arkansas United has standing as an organization to bring suit on its own behalf.  Courts have long recognized that an organization is injured when it has to divert resources from one activity to another in response to the alleged harm.  *See, e.g.*, *Havens Realty Corp.*, 455 U.S. at 379 (finding organizational standing where the entity alleged it had to "devote significant resources to identify and counteract" the defendant's unconstitutional actions); *cf. Nat'l Fed'n of the Blind of Mo. v. Cross*, 184 F.3d 973, 980 (8th Cir. 1999) (recognizing that a plaintiff organization could establish standing by pleading that it has been impacted in a

measurable way, such as expending resources, losing members, or being prevented from carrying out a particular initiative).   Here, Plaintiffs allege that the state laws they challenge forced them to divert staff and resources from get-out-the-vote phone-banking efforts. *See* Doc. 79, ¶ 54.  As a result, Arkansas United was unable to meet "the phone-banking deliverables that its funder required under the terms of its grant [and] may therefore lose future funding and have fewer paid staff to dedicate to phone banking and voter outreach in future elections."  *Id.*  This diversion also meant that Arkansas United "called fewer potential voters from the Arkansas immigrant and Latino community . . . to give them important information about the election and encourage them to vote" and thereby "was thwarted in achieving its mission."  *Id.* at ¶ 56.  Furthermore, Plaintiffs allege that Arkansas United had to expend resources to coordinate the additional staff and volunteers who had to be deployed to assist in polling places as a result of the state's limit on the number of voters an individual could assist and the risk of criminal prosecution for exceeding that limit.  *Id.* at ¶ 57.  These specific allegations establish that Arkansas United has alleged a measurable injury-in-fact.

Nor is the Court persuaded by State Defendants' argument that Plaintiffs' alleged injury is not the type of harm Section 208 of the VRA was intended to prevent.  In *Havens Realty*, the federal statute under which the plaintiff brought suit, the Fair Housing Act ("FHA") made it unlawful for any covered person or entity "[t]o represent to any person because of race, color, religion, sex, or national origin that any dwelling is not available . . . when such dwelling is in fact so available."  455 U.S. at 373 (quoting 42 U.S.C. § 3604(d)).  Though the plaintiff organization was not an individual seeking housing, the Supreme Court nevertheless concluded that if the defendants' "steering practices have

perceptibly impaired [the plaintiff organization's] ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact." *Id*. at 379. The "concrete and demonstrable injury to the organization's activities" paired with the need to divert resources to counteract the allegedly wrongful conduct was sufficient injury to give the plaintiff organization standing to challenge the defendants' violation of the FHA. *Id.*

Subsequently, other courts have relied on *Havens Realty* to find injury-in-fact to organizations offering voter assistance when the organization was forced to devote resources to counteract the effects of the state voting laws alleged to conflict with federal voting laws. For example, in *OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017), the plaintiff was a nonprofit organization conducting get-out-the-vote efforts among voters with limited English proficiency. The suit challenged as preempted by Section 208 a Texas law restricting who could assist such voters. The plaintiff organization alleged that it had been injured by the need for "additional time and effort spent explaining the Texas provisions at issue to limited English proficient voters" because "addressing the challenged provisions frustrates and complicates its routine community outreach activities." *Id.* at 610. The Fifth Circuit held this was a sufficient injury-in-fact to establish organizational standing because the Texas law at issue forced the nonprofit to divert resources and "perceptibly impaired [its] ability to get out the vote among its members." *Id.* at 612 (internal quotation marks omitted). *See also Fla. State Conf. of N.A.A.C.P. v. Browning,* 522 F.3d 1153, 1165–66 (11th Cir. 2008) (organizations challenging the state procedures for first-time registrants alleged an injury-in-fact sufficient to support organizational standing where the plaintiff organizations "reasonably anticipate that they

will have to divert personnel and time to educating volunteers and voters on compliance with [the registration requirements] and to resolving the problem of voters left off the registration rolls on election day"); *Common Cause Ind. v. Lawson*, 937 F.3d 944, 952 (7th Cir. 2019) (plaintiff entity was injured where it had "devoted additional time and resources to ameliorating" the effects of a state voter roll provision that would automatically remove a voter from the state roll based on information from a third-party database); *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1039 (9th Cir. 2015) (plaintiff organization's alleged injury of diversion of resources supported lawsuit alleging state's failure to comply with a federal law intended to facilitate voter registration by low-income citizens and those with disabilities); *Scott v. Schedler*, 771 F.3d 831, 837 (5th Cir. 2014) (plaintiff organization had standing to sue for state's failure to provide recipients of federal benefits with voter registration forms, as required by the National Voter Registration Act, where the plaintiff organization alleged it had to devote resources to counteract the violation).  In each case, the federal law at issue protected the rights of the voter, not the plaintiff entity, and in each case, the organization established standing by showing that the state's alleged violation of the federal law vis-à-vis voters required the organization to divert resources to respond.  The same is true here.  Arkansas United has pleaded sufficient facts, taken as true, to establish that it suffered an injury-in-fact because of the six-voter limit.  It is of no significance that Plaintiffs are not themselves voters denied the protections of Section 208.

> 2. *Plaintiffs' Injury is Traceable to State Defendants and Redressable*

Plaintiffs have also alleged sufficient facts to demonstrate that the alleged injury is fairly traceable to State Defendants.  As alleged in the Amended Complaint, the members

of the State Board of Election Commissioners are responsible for "providing statewide guidance and training to election officers and county election commissioners." (Doc. 79, ¶ 14). The Board also "monitors compliance by local election authorities with federal and state election laws." *Id*. Secretary Thurston is the chairperson of the Board and the state's chief election official. *See id*. at ¶ 13. Thus, Plaintiffs' alleged injury is fairly traceable to State Defendants because State Defendants train the county officials and monitor their compliance with state and federal election laws, including the six-voter limit.

Similarly, Plaintiffs' injury is redressable by a favorable decision. Since State Defendants are responsible for oversight and training of county election commissions, a declaratory judgment that the six-voter limit is unconstitutional and an injunction preventing further implementation will cause State Defendants to provide updated training to county election officials, providing redress for Plaintiffs' alleged injury. *See OCA-Greater Houston*, 867 F.3d at 613–14 (holding that where a state election statute was preempted by the VRA, plaintiffs' injury was "without question, fairly traceable to and redressable by the . . . Secretary of State, who serves as the 'chief election officer of the state'") (quoting Tex. Elec. Code § 31.001(a)).

### C. Prosecuting Attorneys are not Necessary Parties

Next, Defendants claim that the prosecuting attorneys are necessary and indispensable parties, and because Plaintiffs failed to include them as parties, the Court should dismiss the action pursuant to Rule 12(b)(7). These parties are necessary, State Defendants argue, because Plaintiffs seek an injunction against the implementation or enforcement of Arkansas Code § 7-5-310(b)(4)(B), violations of which are prosecuted by prosecuting attorneys, not by state or county election officials. Since State Defendants

do not enforce the six-voter limit, they argue, Plaintiffs cannot obtain the relief they seek without the participation of the local prosecuting attorneys.

To determine whether a party is necessary or indispensable, courts conduct a context-sensitive inquiry under Rule 19. *See Two Shields v. Wilkinson*, 790 F.3d 791, 798 (8th Cir. 2015). Courts begin the inquiry of whether to dismiss under Rule 12(b)(7) by determining if the party is necessary under Rule 19(a)(1). Pursuant to Rule 19(a)(1), a party is necessary if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
>> (i) as a practical matter impair or impede the person's ability to protect the interest; or
>>
>> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

The Court finds that the local prosecuting attorneys are not necessary parties. First, the Court can grant complete relief among the existing parties. As already discussed above with regard to traceability and redressability, State Defendants train county election officials in election procedures, including their obligation to keep a list of assistors and their power to transmit possible violations to the prosecuting attorney. A declaratory judgment that the six-voter limit is preempted by Section 208 and an injunction prohibiting Defendants from enforcing it will provide complete relief among the existing parties. Thus, the requirements of Rule 19(a)(1)(A) are satisfied.

To the extent that State Defendants argue that the local prosecuting attorneys have an interest in the outcome of the litigation, the Court notes that no prosecuting

26

attorneys' offices have claimed such an interest pursuant to Rule 19(a)(1)(B). Furthermore, the Court is confident that State Defendants are zealously advocating for the general constitutionality of the six-voter limit, and the ability of the local prosecuting attorneys to protect their interests is not impaired or impeded. *Cf. Rochester Methodist Hosp. v. Travelers Ins. Co.*, 728 F.2d 1006, 1016 (8th Cir. 1984) (holding that the Department of Health and Human Services ("HHS") was not a necessary party under Rule 19(a)(1) or (2) where it sought to intervene because of a potential obligation to indemnify Travelers but where a United States Attorney was representing Travelers and "making every argument that HHS would or could make if it had been allowed to intervene formally").  For these reasons, the Court rejects State Defendants' argument that the Amended Complaint should be dismissed for failure to join the prosecuting attorneys.

### D.  Plaintiffs State a Claim for Relief

The Court now turns to State Defendants' argument that Plaintiffs fail to state a claim for which relief can be granted pursuant to Rule 12(b)(6).  Plaintiffs' claim is that Arkansas Code §§ 7-5-310(b)(4)(B), 7-5-310(b)(5), 7-1-103(a)(19) and 7-1-103(b)(1) are preempted by Section 208 of the VRA because the voter assistance restrictions in Arkansas law make it an "impossibility" for a voter with limited English proficiency to choose an assistor when that assistor has already helped six other voters.  Plaintiffs' argument thus presents a question of conflict preemption.  "Conflict preemption exists where a party's compliance with both federal and state law would be impossible or where state law would pose an obstacle to the accomplishment of congressional objectives." *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 780 (8th Cir. 2009). "Whether a particular federal statute preempts state law depends upon congressional

purpose." *In re Aurora Dairy Corp. Organic Milk Mktg. & Sales Pracs. Litig.*, 621 F.3d 781, 791 (8th Cir. 2010).  "There is a presumption against preemption in areas of traditional state regulation, [which] is overcome if it was the clear and manifest purpose of [Congress] to supersede state authority."  *Wuebker v. Wilbur-Ellis Co.*, 418 F.3d 883, 887 (8th Cir. 2005) (internal quotation marks omitted).

State Defendants argue that Plaintiffs fail to state a claim because the challenged laws are reasonable, nondiscriminatory, and further a compelling state interest.  State Defendants also argue that the right to choose an assistor protected by Section 208 does not extend to *any* person of the voter's choosing, and the state may place additional restrictions on the choice of assistor without creating a conflict with Section 208.

The discussion of Section 208 in the Senate Report addresses the issue of state legislation as follows:

> The Committee intends that voter assistance procedures, including measures to assure privacy for the voter and the secrecy of his vote be established in a manner which encourages greater participation in our electoral process.  The Committee recognizes the legitimate right of any State to establish necessary election procedures, subject to the overriding principle that such procedures shall be designed to protect the rights of voters.
>
> State provisions would be preempted only to the extent that they unduly burden the right recognized in this section, with that determination being a practical one dependent upon the facts.  Thus, for example, a procedure could not deny the assistance at some stages of the voting process during which assistance was needed, nor could it provide that a person could be denied assistance solely because he could read or write his own name.
>
> By including the blind, disabled, and persons unable to read or write under this provision, the Committee does not require that each group of individuals be treated identically for purposes of voter assistance procedures.  States, for example, might have reason to authorize different kinds of assistance for the blind as opposed to the illiterate.  The Committee has simply concluded that, at the least, members of each group are entitled to assistance from a person of their own choice.

S. Rep. No. 417, 97th Cong., 2d Sess. at 62–63.

The language of the Senate Report suggests that some state legislation on the topic of voter assistance is permissible.  Given the Committee's admonishment that the inquiry of whether a state provision unduly burdens the right to have the assistance of a person of the voter's choice is "a practical one dependent upon the facts," the Court finds it inappropriate at this juncture to take up whether the state laws challenged here impermissibly conflict with Section 208.  The standard applicable to a motion to dismiss is a generous one that assumes all facts pleaded are true and makes reasonable inferences in Plaintiffs' favor.  The Amended Complaint pleads sufficient facts to allow the Court to make the reasonable inference that the six-voter limit may unduly burden a voter with limited proficiency in English.  For example, Plaintiffs allege that because of the limit, their members "are prevented from selecting their preferred voter assistor and must rely on assistors that they do not fully trust to help them translate and cast their ballot."  (Doc. 79, ¶ 51).  Plaintiffs further allege that some staff and volunteers from whom voters might have wanted assistance declined to help "[b]ecause of the threat of criminal prosecution and the fear associated with their names appearing on the list."  *Id.* at ¶ 61.  While these assertions might not be sufficient, without more, to create a genuine dispute of material fact at summary judgment, they are adequate to satisfy the pleading standard and state a claim that Arkansas Code §§ 7-5-310(b)(4)(B), 7-5-310(b)(5), 7-1-103(a)(19) and 7-1-103(b)(1) are preempted by Section 208.

### E.  Laches Does Not Bar Plaintiffs' Claims

Finally, the Court turns to State Defendants' argument that laches bars Plaintiffs' claims.  State Defendants argue that the laws Plaintiffs challenge have been in effect for

more than a decade and that State Defendants would be burdened if they had to modify their "familiar training and procedures" and implement "entirely new ones."  (Doc. 87, p. 25).  The doctrine of laches is an equitable defense . . . ."  *Goodman v. McDonnell Douglas Corp.*, 606 F.2d 800, 804 (8th Cir. 1979).  "For the application of the doctrine of laches to bar a lawsuit, the plaintiff must be guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant."  *Id*.   Neither of the elements of the defense is satisfied here.

First, the Court cannot conclude that Plaintiffs are guilty of unreasonable and inexcusable delay in bringing this suit.  Even though the six-voter limit was enacted more than a decade ago, Plaintiffs would not have had standing to challenge it until they could plead an injury-in-fact.  State Defendants have not offered any basis for the Court to conclude that Plaintiffs experienced harm long before this suit was filed.  In fact, the Amended Complaint indicates that it was only in October 2020, in light of the response to their voter outreach efforts, that Plaintiffs realized there might be a greater number of voters than usual requesting Plaintiffs' assistance on Election Day.  (Doc. 79, ¶ 55)

Further, the equitable basis for this defense is made even less compelling by the fact that Plaintiffs seek only prospective relief.  They are not claiming damages for previous elections in which they failed to bring suit.  Finally, State Defendants have not identified any legitimate prejudice.  There are many months remaining before the next election.  State Defendants (and County Defendants) have ample time to adjust their practices to conform to the VRA.  The generalized burden of modifying "familiar training and procedures" to conform with federal law cannot constitute prejudice for equitable purposes.

### IV.  STATE DEFENDANTS' MOTION FOR INTERLOCUTORY APPEAL

In the alternative, State Defendants ask the Court to stay discovery and certify various questions for interlocutory appeal under 28 U.S.C.§ 1292(b).  A district judge may certify for interlocutory appeal an order that "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).  In *Control Data Corp. v. IBM*, 421 F.2d 323 (8th Cir. 1970), the Eighth Circuit cautioned that "[i]t has long been the policy of the courts to discourage piece-meal appeals because most often such appeals result in additional burdens on both the court and the litigants. Permission to allow interlocutory appeals should thus be granted sparingly and with discrimination."  *Id.* at 325.

State Defendants identify seven questions they characterize as "not only issues of first impression in the Eighth Circuit but also novel questions of federal law that have yet to receive the considered attention of *any* court of appeals." (Doc. 87, p. 31 (emphasis in original)).  The Court disagrees.  None of the questions for which State Defendants seek certification are issues "as to which there is substantial ground for difference of opinion." As is clear from the discussion above, the Court does not consider it to be a close question whether voters with limited-English proficiency are protected by Section 208—State Defendants' first question—and myriad courts and the Department of Justice have reached the same conclusion, which is also supported by the legislative history.  *See supra* pp. 10–12.  Since the Court addressed only the *Ex parte Young* exception to state sovereign immunity and not abrogation by Congress, State Defendants' second question is also inappropriate for interlocutory appeal.  As to whether Section 208 is congruent and

proportional to a history of violations, the Court considers that the text of the VRA and the legislative history amply support an affirmative response to questions three and four.  *See supra* pp. 15–16.  And given the number of courts across the country that have taken up claims under Section 208 on the merits, the stringent requirements for appeal under § 1296(b) are not satisfied here.  Nor is it a close question whether the VRA contains an explicit private right of action or whether plaintiff entities can establish organizational standing to challenge violations of statutes that protect the rights of voters.  The Court's discussion above, *supra* pp. 16–18 & 23–24, makes clear that other courts that have considered State Defendants' fifth and sixth questions for interlocutory appeal have consistently reached the same conclusion as this Court.  Finally, the Court has not reached a final ruling on the applicability of the undue-burden legal standard State Defendants invoke and the seventh question on which they seek interlocutory appeal. The Court simply concluded that to the extent the Senate Report supports the notion that some state restrictions may be permissible, Plaintiffs have nevertheless sufficiently pleaded their claims.  For these reasons, none of the questions for which State Defendants seek certification are appropriate for interlocutory appeal under 28 U.S.C. § 1292(b), and this alternative relief is also denied.

## V.  CONCLUSION

Accordingly, the Motions to Dismiss filed by Benton County Defendants (Doc. 84), Sebastian County Defendants (Doc. 82) and State Defendants (Doc. 86) are **DENIED**. State Defendants' request that, in the alternative, the Court stay discovery and certify issues for appeal under 28 U.S.C. § 1292(b) is also **DENIED**.

**IT IS SO ORDERED** on this 5th day of February, 2021.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE