**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

ARKANSAS UNITED, et al.                                           PLAINTIFFS,

v.                              No. 5:20-CV-05193-TLB

JOHN THURSTON, in his official capacity as
the Secretary of State of Arkansas, et al.                          DEFENDANTS.

### BRIEF IN SUPPORT OF STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs purport to bring suit under Section 208 of the Voting Rights Act despite not being "aggrieved persons" under that Act. *Roberts v. Wamser*, 883 F.2d 617, 624 (8th Cir. 1989). They are, therefore, precluded from maintaining this action as a matter of law. Section 208 protects the right of voters to *choose* a trusted assistant. But that is not the right Plaintiffs seek to vindicate here. Instead, their stated purpose is to ensure that they can *provide* assistance—which is not a right Section 208 protects. But even assuming it were, Plaintiffs further lack standing because Arkansas's six-voter limit did not prevent Arkansas United from assisting anyone at the polls, and Plaintiff Reith did not even try to assist a single voter.

Plaintiffs cannot identify any voter who lacked access to the language assistance they needed to vote, and they are precluded from asserting the rights of any unascertainable third-party voters. Plaintiffs further cannot meet their burden of showing a resource-diversion injury, and they cannot show associational standing because there is no evidence that Arkansas United's members are registered voters whose rights could even potentially be burdened by Arkansas's law. Moreover, Plaintiffs fail to invoke the subject-matter jurisdiction of this Court because they cannot take advantage of the narrow exception to sovereign immunity established by *Ex parte Young*, 209 U.S. 123 (1908), to bring the claims they assert.

Even if Plaintiffs could surmount these formidable jurisdictional obstacles, their claims would still fail on the merits because the six-voter limit does not unduly burden voters' Section 208 rights. The lack of an undue burden is most obvious in the fact that there is no evidence that any voter has been affected by the law. That is also apparent from the fact that, as a structural defense against abuse of the voting process, Arkansas's six-voter limit furthers Arkansas's important (and even compelling) interests in combating fraud, ensuring that votes are cast without even well-meaning assistants exerting undue influence, and easing burdens on poll workers. Both Congress and the Supreme Court recognize that an individual's right to choose is circumscribed in light of such important and compelling state interests. Therefore, Arkansas's law is well within the latitude retained by the States to regulate the field of persons who may assist voters consistent with Section 208.

## BACKGROUND AND FACTS

### A.    Section 208 of the Voting Rights Act

The Voting Rights Act of 1965 was landmark legislation that prohibited practices designed to frustrate African-Americans' exercise of the right to vote. First amended in 1970, Pub. L. No. 91-285, 84 Stat. 315 (1970), then again in 1975, Pub. L. No. 94-73, 89 Stat. 400 (1975), it was amended for a third time in 1982. Pub. L. No. 97-205, 96 Stat. 131 (1982). The bulk of the 1982 Amendments were modifications to existing sections of the Voting Rights Act.

In contrast, the portion of the Voting Rights Act at issue this lawsuit, Section 208, was a new provision tacked onto the end of the 1982 Amendments. It applies nationwide and was designed to protect the right to a secret ballot of the very different class of "blind, disabled, or illiterate persons." *See* Section 208, codified at 52 U.S.C. 10508 (section heading titled "§ 10508. Voting assistance for blind, disabled or illiterate persons"); s*ee Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) ("'[T]he title of a statute and the heading of a section' are 'tools

2

available for the resolution of a doubt' about the meaning of a statute." (quoting *Trainmen v. Baltimore & Ohio R. Co.,* 331 U.S. 519, 528-29 (1947))).

Section 208 is the product of concerns raised by the National Federation of the Blind. S. Rep. No. 97-417, 97th Cong., 2d Sess., at 62 n.207 (1982) (citing the National Federation of the Blind's concern that voting "assistance provided by election officials . . . infringes upon their right to a secret ballot"); *see* Thomas M. Boyd and Stephen J. Markman, *The 1982 Amendments to the Voting Rights Act: A Legislative History*, 40 Wash. & Lee L. Rev. 1347, 1419 n.357 (1983). Those concerns were expressed in a letter submitted by Dr. James Gashel, Director of Governmental Affairs for the National Federation of the Blind, who explained the need to balance blind citizens' interest in voter assistance with their interest in voter privacy. *Voting Rights Act: Hearings before the Subcommittee on the Constitution of the Committee on the Judiciary*, United States Senate, 97th Cong., 2d Sess. Vol. 2, Appx., at 64-66 (1982). Dr. Gashel explained that until the early 1960s, assistance to blind voters was largely provided by election officials. *Id.* at 65. Typically, election personnel from each party would accompany a blind voter into the booth to assist in marking the ballot and to guard against voter manipulation or other fraudulent conduct. *Id.* But that meant sacrificing the secret ballot and "suffer[ing] the indignity of second-class status every time they go to cast their ballots." *Id.* at 66. Dr. Gashel therefore urged the Senate to protect blind citizens' rights by allowing them to have assistance while at the same time protecting their privacy. *Id.*

Congress passed Section 208 upon finding that blind, disabled, and illiterate citizens "are more susceptible than the ordinary voter to having their vote unduly influenced or manipulated." S. Rep. No. 97-417, 97th Cong., 2d Sess., at 62 (1982). Citing the National Federation of the Blind letter, the Senate Report explained that "having assistance provided by election officials

3

discriminates against those voters who need such aid because it infringes upon their right to a se-

cret ballot and can discourage many from voting for fear of intimidation or lack of privacy." *Id.*

at 62 n.207.

At the same time, the Report expressly "recognize[d] the legitimate right of any state to

establish necessary election procedures, subject to the overriding principle that such procedures

shall be designed to protect the rights of voters." *Id.* at 63. "State provisions would be

preempted only to the extent that they unduly burden the right recognized in [section 208], with

that determination being a practical one dependent upon the facts." *Id.*

The 1982 Amendments, including Section 208, do not address "limited English profi-

cient" voters. Rather, that phrase comes from the 1992 amendments to (the very different) Sec-

tion 203 of the Voting Rights Act. *See* Voting Rights Language Assistance Act of 1992, Pub. L.

No. 102-344, 106 Stat. 921, codified at 52 U.S.C. 10503(b)(3)(B) (defining "limited-English pro-

ficient" as "unable to speak or understand English adequately enough to participate in the elec-

toral process"). Section 203's requirements were expressly designed to prohibit differential

treatment of, and disparate impact on, "language minorities." 52 U.S.C. 10503(a). Those re-

quirements apply exclusively to jurisdictions meeting certain demographic criteria. *See id.*

10503(b)(2) (defining covered jurisdictions in terms of population percentages of "single lan-

guage minorit[ies]" who are "limited-English proficient"). Arkansas has no Section 203-covered

jurisdictions. *See* "Covered Jurisdictions," About Language Minority Rights, *U.S. Dep't of Jus-

tice* (March 11, 2020)[1] (linking to "the most recent determinations for Section 203"[2]). Thus, in

---

[1] https://www.justice.gov/crt/about-language-minority-voting-rights

[2] https://www.justice.gov/crt/file/927231/download

contrast to Section 208's broad, national coverage, the only provisions of the Voting Rights Act related to "language minorities" are narrow in their statutorily prescribed geographic scope.

### B.    Arkansas's Efforts to Facilitate Voting While Ensuring Election Integrity

Arkansas has an especially egregious and well-documented history of election fraud.  *See* Jay Barth, "Election Fraud," *CALS Encyclopedia of Arkansas* (January 25, 2018).[3]  The memoir of the Hon. Tom Glaze, the late Arkansas Supreme Court Justice and crusader against election fraud, explains that "Arkansas . . . is the one state where fraud was so dire and so perniciously ignored that citizens were forced to conduct their own investigations and file lawsuits to obtain an honest accounting and tabulation of the votes."  Tom Glaze, *Waiting for the Cemetery Vote: The Fight to Stop Election Fraud in Arkansas* x (2011).

Glaze explains that, for example, the Conway County sheriff's holing up in the court-house on election night in 1958 to stuff the ballot box with fraudulent ballots was a common practice of that era.  *Id.* at 39-40.  The 1964 passage of Amendment 51, which established a voter registration system, was the first "challenge to the whole culture of election theft" in Arkansas. *Id.* at 33.  But efforts to reform balloting were rebuffed by recalcitrant elements in the legislature, *id.* at 69-72, 210, and citizen lawsuits proved almost entirely fruitless.  *See, e.g.*, 137-63.

Not until the closing years of the twentieth century did the General Assembly begin to enact strict requirements for handling ballots, *id.* at 210, and even that has not rooted out efforts at election fraud.  For example:

- In 1999, 518 ballots were invalidated in a special election for a municipal judgeship in Camden, overturning the certified results and changing the outcome.  *Id.* at 210-11.

- In 2003, a Phillips County, Arkansas man named Larry Gray pleaded guilty to fraudulently applying for hundreds of absentee ballots and submitting 98 of them to influence

---

[3] https://encyclopediaofarkansas.net/entries/election-fraud-4477/

the outcome of the Democratic primary. *See United States v. Gray*, No. 4:02CR00185 (E.D. Ark 2002); "Election Fraud Cases," *The Heritage Foundation.*[4]

- In 2005, hundreds of fraudulent absentee ballots were cast in a state-senate primary election. Glaze, *Waiting for the Cemetery Vote*, at 211-14.

- And in 2012, four Crittenden County, Arkansas men pleaded guilty to conspiracy to bribe voters to influence votes. *See* "Four Crittenden County Men Charged with Conspiracy to Commit Election Fraud," *Archive of the United States Attorney's Office for the Eastern District of Arkansas.*[5]

In this last example, harking back to an infamous Arkansas tradition, the men admitted providing chicken dinners, cheap vodka, and cash to voters in exchange for their votes. *Id.*; *see* Glaze, *Waiting for the Cemetery Vote*, 177-92. More recently, the State Board has been notified of individuals suspiciously bringing "elderly people to the polls to vote" in large numbers. McKim Dep. 27.

In 2003, the General Assembly passed "An Act to Revise the Provisions Concerning Disabled Voters," which ensured that disabled voters enjoyed the right to a trusted assistant in the polling booth. 2003 Ark. Act 1308, 84th General Assembly, Reg. Sess. (Apr. 14, 2003) (amending Ark. Code Ann. 7-5-310). The law was amended in 2009 to protect against abuse of the process by precluding individuals from assisting more than six voters at the polls in any election and to make a violation a misdemeanor offense. 2009 Ark. Act 658, sec. 1, 87th General Assembly, Reg. Sess. (Mar. 27, 2009) (amending Ark. Code Ann. 7-1-103); *id.*, sec. 3 (amending Ark. Code Ann. 7-5-310).

The challenged law provides that "[n]o person other than [an election official] shall assist more than six (6) voters in marking and casting a ballot at an election." Ark. Code Ann. 7-5-

---

[4] https://www.heritage.org/voterfraud/search?&state=AR

[5] https://www.justice.gov/archive/usao/are/news/2012/September/Hallumetal_election-fraud_Infoplea_090512.html

310(b)(4)(B).  A person who assists more than six voters in violation of this provision commits a Class A misdemeanor.  *Id.* 7-1-103(a)(19)(C), (b)(1).  But Arkansas law does not subject a voter who *receives* assistance to any penalty.  *See* i*d.* 7-1-103(a)(19)(C) (prohibiting only "[p]roviding assistance" to more than six voters).  Poll workers have a duty to maintain a list of the names and addresses of all persons assisting voters.  *Id.* 7-5-310(b)(5).

The six-voter limit "is designed to prevent an abuse of the assistance process," including "undue influence on how the voter vote[s] their ballot."  Shults Dep. 23; Hassler Dep. 43; McKim Dep. 26-27.  Arkansas law does not burden poll workers with the responsibility to "judge whether an assistant is there for the right reasons or wrong reasons."  Shults Dep. 24.  Instead, the six-voter limit "is designed to be a structural defense against abuse of the process."  Shults Dep. 24.  The six-voter limit prevents an individual from "[b]ringing multiple people to the precinct or the poll to . . . vote in a certain way for a certain candidate."  McKim Dep. 27.  Allowing an individual to assist voters without limit would "increase . . . greatly" the potential for fraud.  McKim Dep. 27.  There would be no bar to "people bringing busloads of people into the poll to vote for specific candidates or measures fraudulently."  McKim Dep. 27.

### C.     Arkansas United

Arkansas United is a dues-paying membership organization, but there is no evidence that it members are registered voters.  Reith Dep. 18.  The only services Arkansas United provides to members (as opposed to nonmembers) are for *noncitizens*.  That is, "help . . . with their applications, with green card renewals, DACA, citizenship applications, mainly."  Reith Dep. 76-77; Fonseca Dep. 8.  The organization doesn't "get resources to offer interpretation" services at the polls.  Reith Dep. 39.  Arkansas United receives funds to make phone calls and send text messages to Hispanic voters.  Reith Dep. 27, 39.

Arkansas United had no formal arrangement to provide language assistance at the polls during the 2020 general election.  Reith Dep. 26.  Despite that, on the afternoon of Election Day 2020, Arkansas United sent five people from its office to the nearby Springdale Civic Center to provide language assistance.  Fonseca Dep. 13-14.  This included two staff members, Araceli Gonzalez and Sohary Fonseca, and three volunteers.  Reith Dep. 43; Fonseca Dep. 12; *see* Gonzalez Dep. 11, 43.  The volunteers were Gonzalez's sister Margarita, a friend of Margarita's, and a man named Jaime Cascante.  Gonzalez Dep. 14-15, 41-42; Fonseca Dep. 13-14, 42-44.  There were three bilingual poll workers who provided language assistance at the Civic Center as well.  Fonseca Dep. 43; Reith Dep. 80.  The Civic Center was the *only* place that Arkansas United provided language assistance that day.  Fonseca Dep. 29-30.  Due to the pandemic, Arkansas United was not involved in door-to-door canvassing during the 2020 general election cycle, thus freeing up resources that would ordinarily have been devoted to that purpose for other purposes.  Reith Dep. 35.  There is no evidence that Arkansas United's phone-banking efforts were materially impeded as a result of its efforts to provide language assistance at the polls or Arkansas's six-voter limit.

### D.      Language Assistance at the Polls[6]

Gonzalez was Arkansas United's "main staff person assigned to the polls."  Reith Dep. 41.  She "went to the Civic Center only in the afternoon after lunch."  Gonzalez Dep. 43.  She was the only person with Arkansas United (including staff and volunteers) who assisted six vot-

---

[6] The Arkansas law at issue in this case prohibits persons from "assist[ing] more than six (6) voters in *marking and casting* a ballot at an election."  Ark. Code Ann. 7-5-310 (b)(4)(B) (emphasis added).  Oddly, Arkansas United Director Reith was emphatic that her staff and volunteers do *not* assist voters in marking and casting ballots.  *See* Reith Dep. 14, 15, 21-22, 48.  "[W]hatever assistance it was that was provided by Arkansas United's staff or volunteers, it was not in casting and marking ballots."  Reith Dep. 15; *see id.* 48.

ers.  Reith Dep. 40; Gonzalez Dep. 25.  After she assisted six voters, she did not try to assist anyone else.  Gonzalez Dep. 25-26.  While she was there, her sister Margarita and her friend arrived at the Civic Center to provide language assistance.  Gonzalez Dep. 26-27.

For her part, Fonseca had been taking care of personal business that day, and she arrived at Arkansas United's office only "around 2 p.m,," where she spent 30 or 40 minutes.  Fonseca Dep. 34.  The other volunteer, Cascante, arrived at the office, and Fonseca and Cascante went together to the Civic Center.  Fonseca Dep. 12, 35.  This was "before 3 p.m., 2:50 something p.m.," and they had not yet been to the Civic Center that day.  Fonseca Dep. 35.  After some time, despite *not* finding assisting six voters to assist, Fonseca left the Civic Center.  *See* Fonseca Dep. 16, 35.  Cascante stayed another 30 minutes.  Fonseca Dep. 16.  But even though he remained, Cascante assisted only one person, total.  Fonseca Dep. 13-14, 16-17.  "[H]e left before 4 p.m."  Fonseca Dep. 16.  Around "six something p.m.," Fonseca returned to the Civic Center, and Margarita and her friend left.  Fonseca Dep. 39, 43-44.  Fonseca helped only one more person.  Fonseca Dep. 39.

Arkansas United Director Mireya Reith was never needed to provide language assistance at the polls, as there were no voters lacking access to language assistance.  Reith Dep. 44.  In fact, Reith did not assist *any* person in the polling place during the 2020 general election.  Reith Dep. 8; Pl.'s Resp. to Interrogs. 7 (Ans. No. 4).  And although Arkansas United had 16 staff and volunteers trained to provide language assistance, "[t]heir interpretation services weren't needed," either.[7]  Reith Dep. 18, 22-23, 47-48.

---

[7] Arkansas United's staff and volunteers provided language assistance to at most 20 people: Gonzalez helped six.  Gonzalez Dep. 10.  Fonseca helped five.  Fonseca Dep. 10, 35, 39; Reith Dep. 44.  Margarita and her sister each helped four (at most).  *See* Reith Dep. 40-41.  Cascante helped one.  Fonseca Dep. 14.  And Reith did not help anyone.  Reith Dep. 8; Pl.'s Resp. to Interrogs. 7 (Ans. No. 4).

9

Plaintiffs cannot identify a single person who lacked access to the language assistance they needed to vote. Gonzalez Dep. 26; Reith Dep. 45-46; Hassler Dep. 64; Anzalone Dep. 54. The six-voter limit did not prevent Arkansas United, or anyone else, from assisting any identifiable person. Reith Dep. 45-46; Gonzalez Dep. 24, 26; Fonseca Dep. 27-28; *see* McKim Dep. 51-52; Hassler Dep. 79; Anzalone Dep. 54. Plaintiffs never asked to assist more than six voters. Reith Dep. 64.

### E.    How Assistants are Paired with Voters

A voter who enters the Civic Center encounters a poll worker who checks their voter registration. Fonseca Dep. 20-21. If the voter needs assistance of whatever sort, the poll worker provides a card to them. Fonseca Dep. 21. A person directing the line will then point the voter to an individual who can assist them. The voters do not choose who assists them. Fonseca Dep. 22-23. As Fonseca explained, the voters "didn't choose me. There was a person managing the line. . . . [H]e would direct those persons to the volunteers who were in the area at that moment. If it was me, me. If it was another one, another one." Fonseca Dep. 22. Fonseca clarified that by "another one," she means that the person to whom the voter was directed could have been a bilingual poll worker. Fonseca Dep. 22-23. She explained, "It was not like 'I prefer this person to go to this one.' It was like the one who was available, go there." Fonseca Dep. 23.

Similarly, Gonzalez "didn't know any of the people [she] helped." Gonzalez Dep. 21. She explained that voters did not choose her specifically but were directed to her by a bilingual poll worker. Gonzalez Dep. 21. They didn't say, "I want that lady," pointing to Gonzalez, nor did they "call [her] by name and say 'I want Ms. Gonzalez to assist me.'" Gonzalez Dep. 21.

10

### F.    Assisting Inside the Voting Booth

Arkansas law requires that a person "may assist [a] voter in marking and casting the bal-lot according to the wishes of the voter," but he or she must do so "without any comment or in-terpretation," on pain of being "removed from the polling site."  Ark. Code Ann. 7-5-310(b)(4)(A)(i), (ii)(a).  Despite this requirement, there is a danger that an assister's well-inten-tioned efforts to help voters understand the ballot will improperly influence the voter's decision.

Gonzalez, for one, has no background in local government and does not know, for exam-ple, the functions of a county judge. Gonzalez Dep. 29, 49-50.  She received no training in ex-plaining the various positions and measures on the ballot.  Gonzalez Dep. 28.  Despite that, Gon-zalez testified that when voters didn't understand what was on the ballot, she "would explain them to the best of [her] knowledge what each position . . . did."  Gonzalez Dep. 23, 28.  More than just translating the ballot, she would "give them [her] understanding of what each of the po-sitions that were up for election do" and "summarize as best [she] could" the ballot measures. Gonzalez Dep. 23, 28.  After translating one of the ballot measures to a voter in the voting booth, Gonzalez explained that the voter "turned to [her and] sa[id], what does that mean?  So [Gonza-lez] had to say well, it's asking you if you want to vote for or against XYZ.  Again, [the voter] was like, well, what does that mean, what does that do?"  Gonzalez Dep. 50.  "To the best of [her] knowledge, [Gonzalez] tried to" answer those questions.  Gonzalez Dep. 50.  She relied on a flyer that she created that described each position based on general definitions that she found on the internet.  Gonzalez Dep. 29, 31, 46-47, 49.

## SUMMARY JUDGMENT STANDARD

A court should grant summary judgment if the evidence demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter

11

of law.  Fed. R. Civ. P. 56.  The moving party bears the initial burden of demonstrating the absence of a genuine dispute for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets that burden, the nonmoving party must come forward with specific facts that establish a genuine dispute of material fact.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).  A genuine dispute of material fact is presented only if the evidence is sufficient to allow a reasonable jury to return a verdict in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court must view the evidence in the light most favorable to the nonmoving party and must give that party the benefit of all reasonable inferences that can be drawn from the record.  *Spencer v. Jackson Cnty., Mo.*, 738 F.3d 907, 911 (8th Cir. 2013).  If the nonmoving party fails to present evidence sufficient to establish an essential element of a claim on which that party bears the burden of proof, then the moving party is entitled to judgment as a matter of law.  *Celotex Corp.*, 477 U.S. at 322-23.

## ARGUMENT

I.      **Reith and Arkansas United unquestionably lack standing to assert Section 208 claims.**

Plaintiffs fail in numerous ways to carry the burden to establish standing to bring their claims.  First, Plaintiffs are not "aggrieved persons" under the Voting Rights Act.  And, despite bringing suit under a provision that protects the rights of *voters*, Plaintiffs do not bring suit as voters, nor do they even seek to vindicate the particular right protected by that provision—a

12

voter's right to *choose* a trusted assistant.  Second, Plaintiffs cannot assert the rights of unascertainable third-party voters.  Third, Plaintiffs cannot establish a resource-diversion injury.  And, finally, Arkansas United cannot establish associational standing.[8]

> **A.  Plaintiffs lack standing because they do not seek to vindicate the right protected by Section 208—a *voter's* right to *choose* a trusted assistant.**

> **1.  Plaintiffs are not "aggrieved persons" under the Voting Rights Act and do not bring suit as *voters*.**

Plaintiffs assert claims under Section 208 of the Voting Rights Act, which protects the rights of voters to choose a trusted assistant.  52 U.S.C. 10508.  But, first, Plaintiffs do not purport to bring suit under Section 208 as *voters* seeking to vindicate their own rights.  "[S]tanding to sue under [the Voting Rights] Act is limited to the Attorney General and to 'aggrieved persons,' a category that [the Eighth Circuit] hold[s] to be *limited to persons whose voting rights have been denied or impaired*."  *Roberts v. Wamser*, 883 F.2d 617, 624 (8th Cir. 1989) (emphasis added); *see* 52 U.S.C. 10302(c); 52 U.S.C. 10308(d) (only the Attorney General may bring action).  Because Plaintiffs are neither agents of the Attorney General nor "aggrieved persons" under the Voting Rights Act, they lack standing as a matter of law.  That is sufficient, by itself, to dispose of Plaintiffs' claims.  What Plaintiffs actually assert is a heretofore-unknown right to *provide* voting assistance to more than six people in an election.  But there is no such right under Section 208.  *See id.*  In short, because Plaintiffs are not "aggrieved persons" and do not bring

---

[8] In addition, Plaintiffs cannot show an injury (whether in their own right or on behalf of a third party) under Section 208 because that provision is designed to protect the right to a secret ballot of individuals who are "blind[], disab[led], or [unable] to read or write" under Section 208's terms.  52 U.S.C. 10508.  And for the same reason, it is not possible for "a favorable judicial decision" in this lawsuit to "prevent or redress the injury" that Plaintiffs allege.  *Bernbeck v. Gale*, 829 F.3d 643, 646 (8th Cir. 2016) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

suit as voters, they lack standing to bring a Section 208 claim under the Voting Rights Act and Article III of the Constitution.

Even if Plaintiffs did have a Section 208 right to provide assistance, the six-voter limit in fact did not prevent Arkansas United, or anyone else, from providing assistance to any identifiable person during the 2020 general election.[9]  Reith Dep. 45-46; Gonzalez Dep. 24, 26; Fonseca Dep. 27-28; *see* McKim Dep. 51-52; Hassler Dep. 79; Anzalone Dep. 54.  Therefore, Plaintiffs lack standing to bring a Section 208 claim.

        **2.**        **Plaintiffs do not seek to vindicate the voter's right to *choose* a trusted assistant.**

Again, assuming that there were a right to *provide* assistance, Section 208's "legislative history evidences an intent to allow the voter to *choose* a person whom the voter *trusts* to provide assistance."  *Ray*, 2008 WL 3457021, at \*7 (emphases added).  But by challenging the six-voter limit, Plaintiffs are emphatically *not* seeking to vindicate the right to *choose* a *trusted* assistant at all.

The evidence shows that the voters that Arkansas United staff and volunteers assist do not choose them.  As Fonseca explained, the voters "*didn't choose me*.  There was a person managing the line. . . . [H]e would direct those persons to the volunteers who were in the area at that moment.  If it was me, me.  If it was another one, another one."  Fonseca Dep. 22 (emphasis added).  She clarified that by "another one," she meant that the person to whom the voter was directed could have been a bilingual poll worker.  Fonseca Dep. 22-23.  She explained, "It was not like 'I prefer this person to go to this one.'  It was like the one who was available, go there."  Fonseca Dep. 23.  Similarly, Gonzalez "didn't know any of the people [she] helped."  Gonzalez

---

[9] The Amended Complaint's allegations relate only to the November 2020 election.  *See* Am. Compl., DE 79 ¶ 19.

Dep. 21.  She explained that voters did not choose her specifically but were directed to her by a bilingual poll worker.  Gonzalez Dep. 21.  They didn't say, "I want that lady," pointing to Gonzalez, nor did they "call [her] by name and say 'I want Ms. Gonzalez to assist me.'"  Gonzalez Dep. 21.

Plaintiffs cannot identify a single voter who was unable to choose a trusted assistant because that is simply not the right they are seeking to vindicate in this lawsuit.  Rather, Reith explained that the suit's goal is to "ensure" that Arkansas United can provide bilingual assistance at the polls, Reith Dep. 84—which, as the evidence shows, is *not* the same thing as ensuring that individual voters are able to choose a trusted assistant.  Because Plaintiffs do not seek to vindicate voters' right to choose a trusted assistant, they lack standing to bring a Section 208 claim.

### B. Plaintiffs lack standing to assert the rights of unascertainable third-party voters.

Plaintiffs indisputably cannot identify any voter who lacked access to the language assistance they needed to vote.  Gonzalez Dep. 26; Reith Dep. 45-46; Hassler Dep. 64; Anzalone Dep. 54.  They likewise cannot rely on any future "relationship with as yet unascertained [Arkansas voters] who will request, but be denied, [voting assistance], based on the operation of the statute."  *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (quotation and citation omitted).  Supreme Court precedent squarely bars relying on a potential future relationship with an unascertainable party to support standing.  A litigant "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *Id.* at 129.

In *Kowalski*, the Supreme Court held that attorneys did not have third-party standing to assert a constitutional challenge on behalf of future clients.  *Id*. at 134.  In reaching that conclusion, the Court discussed a long line of authorities and observed that third-party standing has

15

been approved only when litigants assert the rights of *known* claimants. *Id.* at 131, 134. Third-party standing is not appropriate when the litigant asserts the rights of hypothetical claimants because there is "no relationship at all" between them. *Id.* at 131. Because Plaintiffs cannot identify any person who will lack access to needed language assistance, this case is on all fours with *Kowalski*. Therefore, Plaintiffs lack standing to assert any claim under Section 208.

      **C.**      **Plaintiffs lack standing because they cannot establish a resource-diversion injury.**

Even if Plaintiffs could overcome these obstacles, they fail to establish a resource-diversion injury. Plaintiffs have previously suggested that their phone-banking efforts were frustrated by Arkansas's six-person limit on assisters. Plaintiffs bear the burden to establish that they had to divert resources *as a result of the six-voter limit*. But there is no evidence to suppose that is the case. First, Arkansas United had no formal arrangement with Washington County to provide language assistance at the polls during the 2020 general election. Reith Dep. 26. In fact, Arkansas United has not acquired funding for language assistance at the polls, but only for phone banking. Reith Dep. 39. And there is no evidence that Arkansas United's phone-banking efforts were materially impeded as a result of Arkansas's six-voter limit. Nor is there any evidence that Arkansas United would have sent fewer people to provide language assistance at the polls if Arkansas had no six-voter limit. Further, due to the pandemic, Arkansas United was not involved in door-to-door canvassing during the 2020 general election cycle. Reith Dep. 35. The man-hours that would ordinarily have been devoted to that canvassing were, therefore, available for other purposes, at Plaintiffs' discretion. There is simply no evidence that Arkansas United's phone-banking efforts (or any other efforts) were impaired as a result of the six-voter limit. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1250 (11th Cir. 2020).

16

**D.      Arkansas United lacks associational standing.**

Arkansas United likewise lacks associational standing.  Arkansas United has dues-paying members, but Plaintiffs have no evidence that these members are registered voters whose rights could even potentially be burdened by the six-voter limit.  Reith Dep. 18.  Noting the lack of evidence that any Arkansas United member is a registered voter is no idle observation.  That is because the only services Arkansas United provides to members (as opposed to nonmembers) are *legal* services from its in-house attorney, Sohary Fonseca, Reith Dep. 76-77, and those legal services consist of assistance for *noncitizens*—"help[ing] applicants with their applications, with green card renewals, DACA, citizenship applications, mainly."  Fonseca Dep. 8; *see* Reith Dep. 46 (no knowledge that any Arkansas United member has been denied voting assistance).  Plaintiffs cannot meet their burden to "make specific allegations establishing that *at least one* identified member had suffered or would suffer harm" as a result of the six-voter limit to support a claim of associational standing.  *Summers*, 555 U.S. at 498 (emphasis added).  Therefore, Arkansas United lacks associational standing.

Because Plaintiffs cannot bear their burden to establish standing, the Court lacks subject matter jurisdiction over Plaintiffs' claims, and summary judgment in Defendants' favor is appropriate.

**II.     Sovereign immunity bars Plaintiffs' claims.**

Plaintiffs cannot overcome the State Defendants' sovereign immunity.  Plaintiffs would have recourse against State Defendants only under the narrow exception established by *Ex parte Young*, 209 U.S. 123 (1908).  But "the *Young* exception must reflect a proper understanding of its role in our federal system and respect for state courts instead of a reflexive reliance on an obvious fiction."  *Idaho v. Coeur D'Alene Tribe of Idaho*, 521 U.S. 261, 270 (1997).  Properly understood, *Ex parte Young* cannot save Plaintiffs' claim for two reasons.

17

**A.      The Court should not create a new private remedy outside of the Voting Rights Act's enforcement regime.**

First, the detailed enforcement mechanisms of the Voting Rights Act contain no indication that Congress authorized anyone other than "the Attorney General or an aggrieved person" 52 U.S.C. 10302(c), to bring state-officer suits under *Ex parte Young* to enforce it.  And "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*."  *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 74 (1996).

The Voting Rights Act sets forth a complex framework for the enforcement of statutorily created prophylactic rights.  *See* 52 U.S.C. 10301 *et seq.*; *id.* 10501 *et. seq.*; *id.* 10701 *et. seq.*  In drafting and amending the Voting Rights Act, Congress could have used existing civil-rights enforcement mechanisms, as it has for other major pieces of legislation.  *See, e.g.*, 42 U.S.C. 12133 (making the remedies available under the Civil Rights Act of 1964 available to any person alleging discrimination under the Americans with Disabilities Act).  But Congress chose *not* to do that.  Instead, it created an independent remedial scheme with a general enforcement mechanism that expressly empowers only "the Attorney General or an aggrieved person," 52 U.S.C. 10302(c), to bring a cause of action based on violations of the Act's provisions.  Allowing Plaintiffs—who, as explained above, are not "aggrieved persons"—to maintain a cause of action under *Ex parte Young* would generate a judicially created remedy of a sort that the Court has cautioned against and that Congress did not contemplate in creating the Voting Rights Act.  So *Young* cannot save Plaintiffs' claim, and summary judgment in the State Defendants' favor is appropriate.

**B.     Plaintiffs have shown no ongoing violation of federal law.**

In addition to the myriad ways that Plaintiffs' claims fail as a matter of law (discussed in other sections), they fail because *Ex parte Young* only "permit[s] the federal courts to vindicate *federal* rights." *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984)) (emphasis added). But any federal enforcement authority under the Fourteenth or Fifteenth Amendments would be invalid as applied to Plaintiffs' claims, meaning that there is no federal right to vindicate.

Even if Section 208 could be reasonably construed to cover "limited English proficient" voters (which it cannot), Congress did not make its intention to authorize third-party lawsuits against the State to vindicate the rights of such voters "*unmistakably clear in the language of the statute*." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (quotations and citations omitted) (emphasis added). Congress did not "identif[y] a history and pattern" of constitutional violations of the right at issue, *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 367 (2001), and Section 208 could not have been a "congruent and proportional" response to any history and pattern of such violations. *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997).

Arkansas's six-voter law is not an "unconstitutional" (or otherwise-invalid) "legislative enactment." *Stewart*, 563 U.S. at 254. In essence, there is no "ongoing violation of federal law." *281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011). Because an official enforcing Arkansas law does not come into conflict with federal law, he is not "stripped of his official or representative character" for the purpose of being subjected to suit under *Ex parte Young*. *Stewart*, 563 U.S. at 254. Again, Plaintiffs' claims are barred by sovereign immunity, and the Court should grant summary judgment in the State Defendants' favor.

19

**III.    The six-voter limit does not unduly burden voters' Section 208 rights.**

The Constitution vests States with a "broad power" to operate elections.  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008).  Federal courts "assum[e] that the historic police powers of the States" are *not* preempted "unless that was the clear and manifest purpose of Congress."  *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668 (2019) (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)).  And courts analyzing Section 208 claims "defer[] to the decision of the elected representatives of the state, provided the challenged regulation does not unduly burden the right to vote."  *Ray v. Texas*, No. 2-06-CV-385, 2008 WL 3457021, at *7 (E.D. Tex. Aug. 7, 2008).

When enacting Section 208, Congress expressly invoked the Supreme Court's well-established undue-burden standard for election regulations.  "In passing § 208, Congress explained that it would preempt state election laws '*only to the extent that they unduly burden the right recognized in* [*Section 208*], with that determination being a practical one dependent upon the facts.'"  *Priorities USA v. Nessel*, 487 F. Supp. 3d 599, 619 (E.D. Mich. 2020) (quoting S. Rep. No. 97-417, at 63 (1982)) (emphasis added).

Therefore, as with any other regulation of election procedures, the challenged laws are permissible "provided that those restrictions are reasonable and non-discriminatory."  *Ray*, 2008 WL 3457021, at *7; *see Miller v. Thurston*, 967 F.3d 727, 740 (8th Cir. 2020) (absent a severe burden, the only question is whether Arkansas law "is reasonable, nondiscriminatory, and furthers an important regulatory interest").  Arkansas need not show any compelling interest or tailoring.  *Wash. State Grange*, 552 U.S. at 458.  The undisputed facts here show that the six-voter limit is not an undue burden.

As an initial matter, Plaintiffs' claims fail as a matter of law because they incorrectly assume that Section 208 covers persons who are "limited English proficient."  Am. Compl., DE 79

20

¶ 3. Yet that phrase does not appear in Section 208's text or anywhere in the legislative history of the 1982 Voting Rights Act Amendments, and that reading is contradicted by the U.S. Code section heading's description of those covered as "illiterate persons." *See* 52 U.S.C. 10508; *see Almendarez-Torres*, 523 U.S. at 234 (section headings are relevant to interpreting statutes). In fact, about a decade after enacting Section 208, Congress chose to add the phrase to an entirely different section of the Voting Rights Act but did not add it to Section 208. 52 U.S.C. 10503 (Section 203); *see* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012) ("[W]here the document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea."). Because Section 208 does not apply to "limited English proficient" voters, Arkansas law creates no undue burden on the rights Plaintiffs assert.

In addition to this fundamental legal flaw in Plaintiffs' claims, it is undisputed that Arkansas's six-voter limit does not discriminate on the basis of race, sex, age, disability, religion, or political party. The undisputed facts demonstrate that it does not unduly burden voters' Section 208 rights as a matter of law.

    **A.**    **The six-voter limit furthers Arkansas's important interests in combating fraud, ensuring that votes are cast without undue influence, and easing burdens on poll workers.**

The challenged provision states that "[n]o person other than [an election official] shall assist more than six (6) voters in marking and casting a ballot at an election." Ark. Code Ann. 7-5-310(b)(4)(B). As in *Ray*, this law furthers the State's important interests in protecting vulnerable populations from fraudulent or manipulative interference with their vote. *See Ray*, 2008 WL 3457021, at *5. In particular, the six-voter limit furthers Arkansas's important interests in combating fraud, ensuring that votes are cast without undue influence, and easing burdens on poll workers.

### 1.    The six-voter limit serves Arkansas's compelling interest in combating fraud.

Arkansas has an especially egregious and well-documented history of election fraud.  *See* Jay Barth, "Election Fraud," *CALS Encyclopedia of Arkansas* (January 25, 2018); Glaze, *Waiting for the Cemetery Vote*, supra.  Especially pertinent here, the State Board has been notified of individuals suspiciously bringing "elderly people to the polls to vote" in large numbers.  McKim Dep. 27.  But even if Arkansas lacked a history of election fraud, "it should go without saying that a State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders."  *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2348 (2021); *Munro v. Socialist Workers Party*, 479 U.S. 189, 195-96 (1986) (a State is "permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively").

"A State indisputably has a compelling interest in preserving the integrity of its election process."  *Brnovich*, 141 S. Ct. at 2347 (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364, (1997) ("States certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials."); *Ohio Democratic Party v. Husted*, 834 F.3d 620, 635 (6th Cir. 2016) (finding the State's interests in preventing voter fraud and increasing voter confidence by eliminating appearances of voter fraud are "undoubtedly important").

Here, the six-voter limit "is designed to prevent an abuse of the assistance process," Shults Dep. 23; McKim Dep. 26-27.  In particular, it prevents "[b]ringing multiple people to the precinct or the poll to . . . vote in a certain way for a certain candidate."  McKim Dep. 27.  Allowing an individual to assist more than six voters would "increase . . . greatly" the potential for fraud.  McKim Dep. 27.  There would be no bar to "people bringing busloads of people into the

22

poll to vote for specific candidates or measures fraudulently." McKim Dep. 27. For these reasons, Arkansas's six-voter limit serves Arkansas's compelling interest in combating fraud.

### 2. The six-voter limit serves the important interest in ensuring that votes are cast without undue influence.

Besides combating purposeful voter manipulation, "[e]nsuring that every vote is cast freely, without intimidation or undue influence, is also a valid and important state interest." *Brnovich*, 141 S. Ct. at 2340. This interest covers undue influence that falls short of intentional election fraud. Voters who require the assistance of another person, whether due to a disability or a language barrier, are especially vulnerable to improper influence due to their relationship of dependence on others.

The assistance provided by Gonzalez—Arkansas United's "main staff person assigned to the polls," Reith Dep. 41—perfectly illustrates this danger. With no training, no background in local government, and confessed ignorance concerning, for example, the functions of a county judge, Gonzalez Dep. 28-29, 49-50, Gonzales nonetheless gave English-deficient voters her personal commentary on the races and measures on the ballot inside the voting booth. Gonzalez Dep. 23, 28, 50. More than just translating the ballot, she would "give them [her] understanding of what each of the positions that were up for election do" and "summarize as best [she] could" the ballot measures. Gonzalez Dep. 23, 28, 50. When a voter "turned to [her and] sa[id], what does that mean?" Gonzales said, "well, it's asking you if you want to vote for or against XYZ. Again, [the voter] was like, well, what does that mean, what does that do?" Gonzalez Dep. 50. "To the best of [her] knowledge, [Gonzalez] tried to" answer those questions. Gonzalez Dep. 50.

As Gonzalez's example amply demonstrates, even well-meaning assistants with (presumably) no fraudulent intent can still improperly influence a voter's decision by providing their own

23

idiosyncratic, mistaken, or partial explanations of the races and measures on the ballot. Arkansas's independent statutory prohibition of assisters providing "commentary or interpretation" on these matters is plainly insufficient, by itself, to deter such conduct by Arkansas United's employees. Ark. Code Ann. 7-5-310(b)(4)(A)(i), (ii)(a). Again, the six-voter limit prevents any single person—regardless of intent—from having an outsized influence on an election.

### 3. The six-voter limit serves Arkansas's important interest in easing burdens on poll workers.

Finally, Arkansas's six-voter limit serves the State's important interest in easing burdens on poll workers. Describing the hectic pace of Election Day, Sebastian County Election Coordinator Meghan Hassler explained that "[w]orking an election, there is a lot of stuff that goes on, you get a lot of phone calls, you solve the problem and you move on." Hassler Dep. 72. Indeed, conducting an election is an enormous undertaking that requires poll workers to strictly maintain the polling place and manage voters while studiously following a massive set of federal laws, state laws, and other election procedures. *See generally* Hassler Dep. 36-39, 43-58. Recognizing the heavy responsibilities placed on the shoulders of poll workers, Arkansas law does not further burden them with the responsibility to "judge whether an assistant is there for the right reasons or wrong reasons." Shults Dep. 24. Instead, the six-voter limit "is designed to be a structural defense against abuse of the process." Shults Dep. 24. This interest in easing administrative burdens of Arkansas poll workers is "undoubtedly important." *Husted*, 834 F.3d at 635. Therefore, the six-voter limit serves Arkansas's important interest in easing burdens on poll workers.

### B. The six-voter limit does not unduly burden voters' Section 208 rights as a matter of law.

Arkansas's six-voter limit does not unduly burden voters' Section 208 rights in the first place because it does not regulate *voters*: Arkansas law does not subject a voter who received

assistance at the poll to any penalty whatsoever.  *See* Ark. Code Ann. 7-1-103(a)(19)(C) (prohibiting only "[p]roviding assistance" to more than six voters).  The law does not interfere in voters' agency or volition concerning their ability to choose a trusted assistant.  In fact, the only conceivable way that the six-voter limit could burden a voter would be *coincidentally*—in an implausible situation where more than six voters chose one-and-the-same person to be their *only* trusted assistant.  And even in that far-fetched scenario, the law would still not pose an *undue* burden given that the law furthers Arkansas's compelling interest in election integrity, among other important interests, discussed above.  The six-voter limit reasonably ensures that a person cannot influence an electoral result under the guise of assisting large numbers of vulnerable voters at the polls.  *See* Ark. Code Ann. 7-5-310(b)(4)(B).  The requirement that poll workers keep a list of all assistors simply ensures that Arkansas can enforce that six-voter limit.  *See id.* 7-5-310(b)(5).  And without any sort of criminal penalty attached, Arkansas's voter-privacy laws would be ineffectual.  *See id*. 7-1-103(a)(19), (b).

In any event, as explained below, Plaintiffs have no evidence that *any* voter has been affected by the six-voter limit.  Further, Plaintiffs' claims require construing Section 208 contrary to Congress's express recognition that States can legitimately regulate the voter-assistance process.  And, finally, Plaintiffs' construction of Section 208 is at odds with how the Supreme Court has construed other, analogous rights.

        1.    **Plaintiffs have no evidence that any voter has been affected by the six-voter limit.**

In light of Arkansas's important and compelling interests, the six-voter limit does not unduly burden voters' Section 208 rights.  Tellingly, Plaintiffs have *no evidence* that any voter has been affected by Arkansas's six-voter limit.  Plaintiffs have no evidence of even a single person who lacked access to the language assistance they needed to vote.  Gonzalez Dep. 26; Reith Dep.

25

45-46; Hassler Dep. 64; Anzalone Dep. 54.  The six-voter limit did not prevent Arkansas United, or anyone else, from assisting any identifiable person.  Reith Dep. 45-46; Gonzalez Dep. 24, 26; Fonseca Dep. 27-28; *see* McKim Dep. 51-52; Hassler Dep. 79; Anzalone Dep. 54.  As in *Nessell*, "[g]iven the lack of evidence that any voters have been affected by the limits on their choice of assistance, there is no basis for the court to conclude that [Arkansas]'s law stands as an obstacle to the objects of § 208."  *Nessel*, 487 F. Supp. 3d 599, 620 (E.D. Mich. 2020), *rev'd on other grounds and remanded*, *Priorities USA v. Nessel*, No. 20-1931, — F. App'x —, 2021 WL 3044270 (6th Cir. July 20, 2021).[10]  Indeed, because Congress sought to "preempt state election laws '*only* to the extent that they *unduly burden* the right recognized in [Section 208],'" Arkansas's six-voter limit must be upheld.  *Id.* at 619 (quoting S. Rep. No. 97-417, at 63 (1982)) (emphases added).

### 2.    Plaintiffs construe Section 208 contrary to Congress's express recognition that States legitimately regulate the voter-assistance process.

In enacting Section 208, Congress expressly "recognize[d] the *legitimate right* of any state to establish necessary election procedures, subject to the overriding principle that such procedures shall be designed to protect the rights of voters."  S. Rep. No. 97-417, 97th Cong., 2d Sess., at 63 (1982).  Arkansas's six-voter limit is designed to protect the rights of voters by affording them their choice of a trusted assistant while simultaneously precluding any person from exercising an outsized influence on the votes of numerous vulnerable persons.  Like the statute upheld in *Ray*, Arkansas's laws are well within the latitude retained by the States to regulate the field of persons who may assist voters.  2008 WL 3457021, at *7.  Plaintiffs' claims depend on

---

[10] The Sixth Circuit reversed the district court only because the latter had enjoined the challenged law on other grounds.  *See Priorities USA v. Nessel*, No. 20-1931, 2021 WL 3044270 (reversing the district court's preliminary injunction).  Therefore, the district court's rejection of the plaintiffs' Section 208 claim remains good law.

26

implausibly "constru[ing] 'a person of the voter's choice' to mean that the voter may choose *any* person, without limitation." *Id.* (emphasis added). But that extreme reading of the statute is contrary to Congress's express intent. Therefore, Arkansas's six-voter limit does not unduly burden voters' Section 208 rights.

### 3. Plaintiffs construe Section 208 contrary to the Supreme Court's construction of analogous constitutional rights.

In addition to congressional intent, the Supreme Court's treatment of constitutional rights to make certain decisions is a useful reference point. For example, a criminal defendant's Sixth Amendment right to "counsel of his own choice" is instructive. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) (quoting *Powell v. Alabama*, 287 U.S. 45, 53 (1932)). Although the right to counsel is fundamental to the American criminal-justice system, "[t]he Sixth Amendment right to choose one's own counsel is circumscribed in several important respects." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Among other things, an attorney who is not a member of the relevant bar or who has a previous or ongoing relationship with the government or another party is disqualified from representing a criminal defendant. This rule helps to ensure that the attorney is motivated to act in the criminal defendant's own interests. Likewise, under Arkansas law, a person who has already accompanied six voters into the voting booth is disqualified from accompanying other voters at least in part because this limits the potential for assisters to act in the interest of someone other than the individual voter.[11] Again, the State's compelling interest in election integrity justifies any burden posed by the six-voter limit. (And any such burden is only hypothetical, for Plaintiffs have no evidence of burden in this case.) Similarly, here,

---

[11] This same concern that the assistant should be motivated to act in the voter's own interest and not in the interest of another is present in Section 208's express exclusion of "the voter's employer or agent of that employer or officer or agent of the voter's union" from the pool of possible assisters in the voting booth. 52 U.S.C. 10508.

27

the State's interest in election integrity is sufficiently compelling to justify Arkansas's six-voter limit while preserving Section 208's right to choose a trusted assistant.

Thus, Section 208 "does not preclude all efforts by the State to regulate elections by limiting the available choices to certain individuals." *Ray*, 2008 WL 3457021, at *7.  Under Plaintiffs' construction, Section 208 would preempt even State penal laws.  "[T]he State would be forced to honor the voter's choice to have an incarcerated family member [assist him or her]." *Id.*  Rejecting that implausible construction, *Ray* concluded that "Section 208 empowers the voter to choose the person who will assist him or her, but the voter is not entitled to his or her preferred choice if that choice is reasonably restricted by the State." *Id.*; *see id.* ("The language of Section 208 allows the voter to choose a person who will assist the voter, but it does not grant the voter the right to make that choice without limitation.").  Reasonable restrictions include penal laws, health-and-safety regulations, and—as here—laws reasonably designed to combat voter fraud and undue influence of vulnerable voters needing assistance.  Therefore, "[t]he State retains some latitude to restrict the field of persons who may assist [voters]." *Id.*

In the law, as in other areas of life, a person's choice is virtually never unlimited in the boundless way that Plaintiffs implausibly contend must be the case here.  Ensuring that voters have a fair opportunity to choose a trusted assistant from the universe of qualified persons does not preclude Arkansas from establishing marginal limitations to limit the potential for fraud or other forms of undue influence.

Finally, because Arkansas's law is justified by the State's compelling interest in the integrity of its electoral process, it would satisfy even the stricter scrutiny that is reserved for severely burdensome regulations.  *See Brnovich*, 141 S. Ct. at 2347 ("A State indisputably has a compelling interest in preserving the integrity of its election process.").  In any case, viewing the

28

facts in the light most favorable to Plaintiffs, there is no remaining dispute of material fact, and

Defendants are entitled to judgment as a matter of law.

## CONCLUSION

For the reasons set forth above, the State Defendants respectfully request that the Court

grant their motion for summary judgment.

Respectfully submitted,

LESLIE RUTLEDGE
Attorney General

Vincent M. Wagner (2019071)
  Deputy Solicitor General
Michael A. Cantrell (2012287)
  Assistant Solicitor General
Michael A. Mosley (2002099)
  Assistant Attorney General
OFFICE OF THE ARKANSAS ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
Ph:    (501) 682-2007
Fax:   (501) 682-8162
Michael.Cantrell@ArkansasAG.gov

*Attorneys for the Secretary of State and State Board
of Election Commissioners*

29