IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

| | |
|---|---|
| ARKANSAS UNITED and L. MIREYA REITH<br><br>            Plaintiffs,<br><br>  v.<br><br>JOHN THURSTON, in his official capacity as the Secretary of State of Arkansas, SHARON BROOKS, BILENDA HARRIS-RITTER, WILLIAM LUTHER, CHARLES ROBERTS, JAMES SHARP, and J. HARMON SMITH, in their official capacities as members of the Arkansas State Board of Election Commissioners, and RENEE OELSCHLAEGER, BILL ACKERMAN, MAX DEITCHLER, and JENNIFER PRICE in their official capacities as members of the Washington County Election Commission, RUSSELL ANZALONE, ROBBYN TUMEY, and HARLAN STEE in their official capacities as members of the Benton County Election Commission, and DAVID DAMRON, LUIS ANDRADE, LEE WEBB, in their capacities as members of the Sebastian County Election Commission, and MEGHAN HASSLER in her capacity as Election Coordinator for the Sebastian County Election Commission<br><br>            Defendants. | Case No. 5:20-cv-05193-TLB |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**I.  INTRODUCTION**

  Section 208 of the federal Voting Rights Act of 1965 ("VRA") provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or

1

agent of that employer or officer or agent of the voter's union." 52 U.S.C. §10508. For voters who are limited English proficient ("LEP"), Section 208 ensures meaningful access to the franchise by permitting these voters to use the help of assistors when they vote.

Arkansas Election Code §§ 7-5-310(b)(4)(B), 7-5-310(b)(5), 7-1-103(a)(19) and 7-1-103(b)(1) (hereinafter collectively the "voter-assistance restrictions") subvert the protections of Section 208 by making it a crime for an individual to assist more than six voters in marking and casting a ballot in an election. The voter-assistance restrictions limit who can serve as an assistor and make it impossible for a voter to use the assistor of his or her choice when that assistor has already helped six voters. The voter-assistance restrictions violate Section 208 of the VRA and the Supremacy Clause, Article VI, Paragraph 2 of the U.S. Constitution.

Plaintiffs respectfully request that the Court grant their motion for summary judgment and declare that the Arkansas voter-assistance restrictions are unconstitutional because they violate the U.S. Constitution's Supremacy Clause and Section 208 of the Voting Rights Act. Plaintiffs also request that the Court enjoin Defendants from enforcing the challenged voter-assistance restrictions in future elections.

## II. STATEMENT OF FACTS

The material facts are set forth in Plaintiffs' Statement of Material Facts pursuant to Local Rule 56.1(a) (hereinafter "SOF ¶ ").

### A. LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Gibson v. Concrete Equip. Co., Inc.*, 960 F.3d 1057, 1062 (8th Cir. 2020). A party may seek summary judgment with respect to all or any part of a claim. Fed. R. Civ. P. 56(a).

Federal Rule 56 gives the moving party the initial burden of explaining the basis of its motion, including "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). The non-moving party then "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (internal quotation marks omitted).

"Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds*." Jackson v. Bauxite Sch. Dist.*, No. 4:08CV03610-WRW, 2009 WL 3261962, at *2 (E.D. Ark. Oct. 8, 2009).

### III.   SUMMARY OF THE ARGUMENT

Section 208 of the federal Voting Rights Act provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. §10508. Section 208's only limitations on who the voter can choose are stated in the statute; the assistor may not be an employer, union officer or an agent of an employer or union officer. The Arkansas voter-assistance restrictions violate Section 208 by preventing voters from receiving help from an assistor who has already helped six voters.  *See* Arkansas Election Code §§ 7-5-310(b)(4)(B); § 7-5-310(b)(5); 7-1-103(a)(19) and 7-1-103(b)(1) (collectively prohibiting individuals from assisting more than six voters in an election).

Thus, the Arkansas voter-assistance restrictions make it impossible for voters to exercise their right under Section 208 to receive assistance from their chosen assistors when those assistors have already helped six other voters. Defendants' denial of necessary assistance to voters who need assistance, including LEP voters, violates Section 208 of the VRA and the Supremacy Clause.

By limiting the universe of assistors to those who have helped less than six voters, the Arkansas voter-assistance restrictions violate Section 208 of the VRA. *See OCA-Greater Houston v. Tex.*, 867 F.3d 604, 615 (5th Cir. 2017) (in challenge to limitation on who could provide interpreter assistance to voters, court "conclude[d] that the limitation on voter choice expressed in Tex. Elec. Code § 61.033 impermissibly narrows the right guaranteed by Section 208 of the VRA."). *See also United States v. Berks Cnty.*, 277 F. Supp. 2d 570 (E.D. Pa. 2003); *Nick v. Bethel*, 2008 WL 11456134 (D. Alaska Jul. 30, 2008).

The voter-assistance restrictions also violate the U.S. Constitution's Supremacy Clause because compliance with both federal and state law is impossible and because the Arkansas restrictions pose an obstacle to the accomplishment of congressional objectives. *See Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 780 (8th Cir. 2009). The voter-assistance restrictions make it impossible for a LEP voter to choose an assistor of his or her choice when that assistor has already helped six other voters. In addition, the voter-assistance restrictions stand as an obstacle to the accomplishment of the congressional goal of reducing barriers for LEP and other voters to participate in the electoral process.

IV. **ARGUMENT**

    A. **Arkansas' Voter-Assistance Restrictions Violate Section 208 of the Voting Rights Act by Preventing Voters from Using Assistors of Their Choice When Those Assistors Have Already Helped six Voters.**

The voter-assistance restrictions of the Arkansas Election Code violate Section 208 of the VRA by prohibiting voters from choosing an assistor who has already helped six other voters during an election. Section 208 of the VRA provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. §10508. Section 208 establishes the right of a LEP voter to bring a person of his or her choice to assist him or her in voting even if that assistor has assisted more than six voters. The VRA defines the terms "vote" and "voting" to include:

> [A]ll action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this chapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election.

52 U.S.C. § 10310.

The Arkansas voter-assistance provisions impose a restriction not found in federal law:

> (i) Arkansas Election Code § 7-5-310(b)(4)(B), which provides: "No person other than [a poll worker or a county clerk] shall assist more than six (6) voters in marking and casting a ballot at an election."
>
> (ii) Arkansas Election Code § 7-5-310(b)(5) which provides: "It shall be the duty of the poll workers at the polling site to make and maintain a list of the names and addresses of all persons assisting voters."
>
> (iii) Arkansas Election Code §§ 7-1-103(a)(19) and 7-1-103(b)(1), which provide: "No person shall . . . [p]rovide assistance to a voter in marking and casting the voter's ballot except as provided in § 7-5-310 . . . Except as otherwise provided, the violation of any provision of this section shall be a Class A misdemeanor.

States or localities that limit the ability of LEP voters to receive assistance from persons of their choice violate Section 208 of the VRA. For example, in *United States v. Berks Cnty.*, the court held that denying Spanish-speaking voters assistance by the person of their choice is a

5

violation of Section 208. 277 F. Supp. 2d 570 (E.D. Pa. 2003). Similarly, in *Nick v. Bethel*, the court found that plaintiffs demonstrated a likelihood of success on their claim that the state violated Section 208 by restricting LEP voters from receiving assistance from a person of their choice. 2008 WL 11456134 (D. Alaska Jul. 30, 2008).[1]

The voter-assistance restrictions in the Arkansas Election Code particularly burden LEP voters, who often rely on help from others to read and cast English-language ballots, by limiting the number of available assistors. LEP voters depend on trusted community organizations, like Arkansas United, to receive the necessary language assistance to help them vote. SOF. ¶ 28.

During early voting in the 2020 General Election, Ms. Susana Terrazas, a registered voter, asked Arkansas United staff member Celina Reyes to assist her in voting. SOF. ¶ 29.

Although Ms. Terrazas can read and understand some English, she is not fluent in the English language and has difficulty understanding some terms in English. SOF. ¶ 30. Ms. Terrazas chose Celina Reyes to assist her in voting so that Ms. Terrazas could exercise her right to vote. SOF. ¶ 32. In prior elections, Ms. Terrazas' son helped her cast her ballot, but he was unavailable to help her vote in the 2020 General Election, so Ms. Terrazas chose Ms. Reyes to help her. SOF. ¶¶ 32-33. Ms. Reyes assisted Ms. Terrazas and Ms. Terrezas' husband, Saul Octavio Acosta, when they voted early in the 2020 General Election. SOF. ¶ 35. However, by the time Election Day arrived, voters who chose and requested assistance from Arkansas United staff and volunteers were not able to receive the assistance they needed because of the Arkansas voter-assistance restrictions. SOF. ¶¶ 49-53. Although four Arkansas United staff and volunteers

---

[1] *See also* Consent Decree, Judgment, and Order, *United States v. Fort Bend Cnty.*, No. 4:09-cv-01058 (S.D. Tex. Apr. 13, 2009); Memorandum of Agreement, *United States v. Kane Cnty.*, No. 07 C 5451 (N.D. Ill. Nov. 7, 2007); Consent Decree, Judgment, and Order, *United States v. Brazos Cnty.*, No. H-06-2165 (S.D. Tex. June 29, 2006); Consent Decree, *United States v. Orange Cnty.*, No. 6:02-cv-737-ORL-22JGG (M.D. Fla. Oct. 8, 2002); Settlement Agreement, *United States v. City of Philadelphia*, No. 2:06cv4592 (E.D. Pa. June 4, 2007); Revised Agreed Settlement Order, *United States v. City of Springfield*, No. 06-301- 23-MAP (D. Mass. Sept. 15, 2006).

were able to help a limited number of voters at the Springdale Civic Center on Election Day, all four either came close to or reached the limit of voters they could assist and Arkansas United turned away other voters who called and requested assistance from Arkansas United because of the 6-person limit. SOF.¶¶ 49-53, 63-77. The voters who were turned away by Arkansas United did not receive the assistance that they requested from their chosen assistors.

The voter-assistance restrictions in the Arkansas Election Code also burden individuals who provide voting assistance to limited English proficient voters by subjecting individual assistors to criminal prosecution and penalties for exceeding the six-person limit, such as Arkansas United's staff and volunteers. SOF. ¶¶ 79-83. For example, Defendants tracked each voter that Ms. Gonzalez assisted in casting their ballot during the 2020 General Election. SOF. ¶ 79. Every single time Ms. Gonzalez assisted a voter with language assistance in casting his or her ballot, a poll worker instructed Ms. Gonzalez to fill a voter assistance card with, among other information, Ms. Gonzalez's name and the name of the voter she assisted. SOF. ¶80. She turned in a completed voter assistance card for each voter she helped to a poll worker. SOF. ¶81. The voter assistor cards clearly stated, "All other persons may assist no more than six voters in marking and casting a ballot at an election." *Id.*

Furthermore , the voter-assistance restrictions in the Arkansas Election Code prevent community organizations, like Arkansas United, from carrying out their work to promote voting and those organizations have to shift resources away from critical tasks. SOF. ¶¶ 55-63. If not for the voter-assistance restrictions, Arkansas United would have been able to use some staff and volunteers for voter assistance and keep the remaining staff and resources focused on critical Arkansas United efforts, such as the Get out the Vote efforts. SOF. ¶ 59.

For example, Ms. Sohary Fonseca, an Arkansas United staff member, had to stop performing her phone banking duties to go assist voters in casting their ballots at the polls because the Arkansas United volunteers already at the polling place were approaching their 6-voter limit. SOF. ¶76. The voter-assistance provisions forced Arkansas United to expend additional resources and staff time to ensure compliance with the six-voter limit. As a result, Arkansas United's staff was unable to complete the phone banking deliverables that its funder required under the terms of its grant. SOF. ¶62.

The voter-assistance restrictions: make it impossible for a LEP voter to choose an assistor of his or her choice when that assistor has already helped six other voters; subject assistors to criminal prosecution and penalties for exceeding the six-voter limit; and prevent community organizations from carrying out their work to promote voting. Defendants' denial of necessary assistance to voters from the assistors of their choice violates Section 208 of the Voting Rights Act.

### B. Section 208 of the Voting Rights Act Preempts the Challenged Arkansas Voter-Assistance Restrictions.

The Arkansas voter-assistance restrictions are preempted because they conflict with Section 208 and thwart the intent of Congress. The Supremacy Clause provides:

> This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding.

Article VI, Paragraph 2 of the U.S. Constitution.

"Conflict preemption exists where a party's compliance with both federal and state law would be impossible or where state law would pose an obstacle to the accomplishment of congressional objectives." *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772,

780 (8th Cir. 2009); *see also Arizona v. United States*, 567 U.S. 387, 406 (2012). Arkansas Election Code §§ 7-5-310(b)(4)(B), 7-5-310(b)(5), 7-1-103(a)(19), and 7-1-103(b)(1) conflict and interfere with Section 208 of the VRA and the accomplishment of congressional objectives, and thus violate the Supremacy Clause.

### i. The State and Federal Voter Assistance Statutes Cannot Co-Exist.

The Arkansas voter-assistance restrictions conflict with Section 208 of the Voting Rights Act because it is impossible to comply with both. Although a voter has the right to vote with the assistance of a chosen assistor, the challenged Arkansas laws limit that right to assistors who have not already helped six other voters.

Under federal law, a limited English proficient voter has the right to receive assistance from any individual who is not an employer or union representative, including the right to receive assistance from an individual who has already assisted six voters. Under state law, the voter cannot receive assistance from an individual who has already assisted six voters and the assistor commits a crime by helping the voter. In the situation in which an assistor has already assisted six voters, what federal law authorizes, state law prohibits.

Federal preemption doctrine holds that "[s]tate laws are preempted when they conflict with federal law. . . . This includes cases where 'compliance with both federal and state regulations is a physical impossibility'" *Arizona v. United States*, 567 U.S. at 399 (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).

The voter assistance restrictions in the Arkansas Election Code make it an "impossibility" for a limited English proficient voter to choose an assistor permitted by Section 208 of the VRA when that assistor has already helped six other voters. *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-143 (1963). By limiting a right created by the federal Voting Rights

9

Act, the Arkansas Election Code "creates a conflict with the plan Congress put in place." *Arizona v. United States*, 567 U.S. at 403.

Section 208 preempts state restrictions on voters' right to receive assistance from the person of their choice. *See, e.g. OCA-Greater Houston v. Texas*, 867 F.3d at 614-615 (invalidating state restrictions on who can serve as an interpreter for voters because Section 208 protects the right to assistance throughout the voting process); *see also DSCC v. Simon*, 950 N.W.2d 280 (Minn. 2020) (striking down statute that prohibited a person from helping more than three Minnesota voters complete their ballots or return their absentee ballots).

In a case similar to the one at hand, the Minnesota Supreme Court concluded that Minnesota's voter assistance restriction was preempted by Section 208 of the VRA. *DSCC v. Simon*, No. A20-1017, 2020 WL 6302422, at *7 (Minn. Oct. 28, 2020). The voter assistance restriction at issue in *DSCC* purported to limit the number of voters an assistor was permitted to help. *Id.* In *DSCC*, the Minnesota Supreme court held that Section 208 preempted the challenged voter-assistance limit, noting that "[a] plain-language comparison leads to the conclusion that Minnesota's three-voter limit on marking assistance can be read to stand as an obstacle to the objectives and purpose of section 208 because it could disqualify a person from voting if the assistant of choice is, by reason of other completed assistance, no longer eligible . . . ." *Id.* at 289. The same is true here.

The Fifth Circuit, in striking down a Texas limitation on voting assistance as preempted by the Voting Rights Act, compared the "unambiguous language" of Section 208 of the VRA to the challenged provision in the Texas Election Code and concluded that "[Texas'] limitation on voter choice . . . impermissibly narrows the right guaranteed by Section 208 of the VRA." *OCA-*

*Greater Houston v. Texas*, at 614-15 (invalidating state law requirement that an interpreter chosen by the voter must be registered to vote in the same county as the voter).

Similarly, in *Democracy Now North Carolina v. North Carolina State Bd. of Elections*, a North Carolina district court held that plaintiffs were likely to succeed on the merits of their claim that Section 208 preempted a North Carolina law that restricted who may assist voters in hospitals, clinics, nursing homes, or rest homes. No. 1:20CV457, 2020 WL 4484063, at *60 (M.D.N.C. Aug. 4, 2020) (invalidating state law that required voter needing assistance to "rely on either a near relative, a legal guardian, or a [multipartisan assistance team] if they are available before they may choose any other person to assist them"). The court reasoned that the challenged state statute's limitation on assistance "does not allow Plaintiff Hutchins to choose the person who will assist him [and thus] these regulations impermissibly narrow Section 208's dictate that a voter may be assisted "by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." *Id.* (emphasis in original).

A federal district court in Michigan also denied a motion to dismiss a voter assistance lawsuit on the grounds that Plaintiffs had stated a preemption claim under Section 208 of the VRA, concluding:

> Section 208 expressly provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice." 52 U.S.C. § 10508. But the Absentee Ballot Law restricts who a voter may choose to assist them in voting. . . . [because] unless the person is a member of the voter's household or family, or an elector registered in Michigan, a voter cannot seek his or her assistance. Section 208, on the other hand, provides that a voter may be given assistance by anyone of that voter's choice.

*Priorities USA v. Nessel*, 19-13341, 2020 WL 2615766, at *14 (E.D. Mich. May 22, 2020).

The Arkansas voter assistance restrictions violate the Supremacy Clause because they "interfere with the careful balance struck by Congress" in granting voters who need assistance the right to choose their assistor. *Arizona v. United States*, 567 U.S. at 406.

### ii. The Challenged Voter Assistance Restrictions stand as an Obstacle to the Accomplishment of Congressional Objectives.

Even if the federal and state voter assistance statutes could coexist, and they cannot, the challenged voter-assistance restrictions are preempted by federal law because they stand as an obstacle to the accomplishment of congressional goals. "The ordinary principles of preemption include the well-settled proposition that a state law is preempted where it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. at 406 (internal quotation marks omitted).

The legislative history of the federal Voting Rights Act generally, and Section 208 specifically, evinces Congress's objective to protect limited English proficient voters.

In the 1975 amendments to the Voting Rights Act, Congress acted purposefully to protect Latino and limited English proficient voters when it expanded federal review of new voting laws to include jurisdictions that had conducted English-only elections. 52 U.S.C.A. § 10303 (f)(3). Referring to Latinos, Asian Americans and Native Americans as "language minorities," Congress connected the need to protect these voters with the need to enforce the voting rights of those who were unable to read or write in English:

> The Congress finds that voting discrimination against citizens of language minorities is pervasive and national in scope. Such minority citizens are from environments in which the dominant language is other than English. In addition they have been denied equal educational opportunities by State and local governments, resulting in severe disabilities and continuing illiteracy in the English language. The Congress further finds that, where State and local officials conduct elections only in English, language minority citizens are excluded from participating in the electoral process. In many areas of the country, this exclusion is aggravated by acts of physical, economic, and political intimidation. The Congress declares that, in order to enforce the guarantees of the fourteenth and fifteenth

12

>amendments to the United States Constitution, it is necessary to eliminate such discrimination by prohibiting English-only elections, and by prescribing other remedial devices.

52 U.S.C.A. § 10303 (f)(1). Based on these findings, Congress prohibited states and political subdivisions from providing "any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots, only in the English language, where the Director of the Census determines that more than five per centum of the citizens of voting age residing in such State or political subdivision are members of a single language minority." 52 U.S.C.A. § 10303 (f)(3). In addition to the Voting Rights Act's nationwide provisions protecting language minority voters, Congress chose to require certain geographic areas (that contain larger populations of language minority and illiterate individuals) to provide translated election materials and language assistance at the polls. 52 U.S.C.A. § 10503 (b)(2).

In 1982, Congress again amended the Voting Rights Act and acted specifically to protect the rights of limited English proficient voters as well as other voters who require assistance to cast their ballots because of disability or an inability to read the language on the ballot. Congress provided: "Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C.A. § 10508.

The legislative history of Section 208 demonstrates that "inability to read or write" includes the inability to read and write because of limited English proficiency. The colloquy between Senator Denton and then-Senator Biden demonstrates lawmakers' intent to protect limited English proficient voters with Section 208:

> Senator DENTON: I just have a question here, Mr. Chairman, for those who are advocating this language, "inability to read or write." It is my understanding that the voting booths have a multilingual kind of aspect. In fact, it is my understanding that Spanish, even the Aleutian tongue is used in some of the booths, and I wonder what language is referred to when one states "inability to read or write"? I just am confused by the intent.
>
> Senator BIDEN. The answer is any language, any language whatsoever, if the person cannot understand for whom they are voting, and they just state they cannot understand that, whether it is Aleutian, or Portuguese or Swahili. If they say they cannot understand it, they cannot read or write or understand what is going on in the booth, and they need help, that is what we are talking about. . . . It is clear on its face what we are talking about. That is what read or write means. Read or write, whatever the language is, that is in the language that the person is required to vote.

Voting Rights Act: Hearing on S. 54, S. 1761, S. 1975, S. 1992 and H.R. 3112 Hearing Before Subcomm. on the Constitution of the S. Comm. on the Judiciary, Volume 2 97th Cong. at 89-90 (1982).

Instead of requiring jurisdictions to translate voting materials or provide interpreters at the polls, Section 208 ensures that a voter with an "inability to read or write" in English (or a disabled voter) can bring the assistor of their choice into the voting booth. In this way, Section 208 works in tandem with the other provisions of the Voting Rights Act; Section 208 provides access to the ballot for limited English proficient voters who live in geographic areas where there are not enough language minorities to trigger the protections of Sections 4(f) or Section 203.

Congress considered that the need for assistance may render such groups—namely, voters who are blind, have a disability, lack a written language, or are "unable to read or write sufficiently well to understand the election material and the ballot"—more susceptible to discrimination or undue influence. *Id.*; *see also* H.R. Rep. No. 227, 97th Cong., 1st Sess. 14 (1981). Congress responded by providing the opportunity for these potentially vulnerable voters to turn to those whom they trusted for assistance. "To limit the risks of discrimination" and "avoid denial or infringement of the right to vote," Congress mandated that such voters "be

permitted to have the assistance of a person of their own choice" during the voting process, including within the voting booth. Senate Report at 62.

Congress also considered whether to restrict who could serve as an assistor and chose to exclude two categories of persons: employers and union representatives. In creating these two categories of excluded individuals, Congress chose to allow all others to serve as assistors. Generally, "[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent. *Hillman v. Maretta*, 569 U.S. 483, 496 (2013) (citation omitted). Thus, Section 208 should not be read to imply restrictions beyond those enumerated. Furthermore, the Supreme Court has repeatedly cautioned against doing exactly what Arkansas has done—creating right-limiting exceptions beyond the ones Congress created. *See, e.g., Republic of Arg. v. NML Capital, Ltd.*, 573 U.S. 134, 144–46 (2014); *United States v. Smith*, 499 U.S. 160, 166–67 (1991).

The voter-assistance restrictions ignore Section 208's plain language guaranteeing the right to choose an assistor of a voter's choice, subject to limited exceptions. The State of Arkansas is not covered by Sections 4(f) or Section 203 of the federal Voting Rights Act. Although Defendant counties provide some resources to LEP voters, those resources are limited and LEP voters vote with the help of their chosen assistors. SOF. ¶¶ 5-15. Washington County Executive Director Jennifer Price expressed concern that there are insufficient resources for LEP voters in Washington County. SOF. ¶¶ 16-17. In fact, Jennifer Price leaned on trusted community organizations, including Plaintiffs Arkansas United, to provide translated materials and other resources to LEP voters during the 2020 General election and prior elections. SOF. ¶ 13.

15

The Latino population in the State of Arkansas is growing, making this an issue of greater concern. SOF. ¶¶ 1-2, 49. The voter-assistance limit reduces the number of trusted and capable bilingual assistors. SOF. ¶ 23.

These factors in isolation, and especially in combination, make it challenging for LEP voters to cast their ballots in the State of Arkansas. The voter assistance restrictions further limit LEP voters' ability to vote. By creating new categories of individuals who are excluded from serving as assistors, beyond those established by Congress in Section 208, the Arkansas voter assistance restrictions thwart the intent of Congress to ensure that voters who need assistance have access to assistors of their choice.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that: this Court grant their motion for summary judgment; declare that Arkansas code §§ 7-5-310(b)(4)(B), 7-5-310(b)(5), 7-1-103(a)(19) and 7-1-103(b)(1) are unconstitutional because they violate the U.S. Constitution's Supremacy Clause and Section 208 of the Voting Rights Act; and enjoin Defendants from enforcing these provisions in future elections.

Dated: September 22, 2021         Respectfully submitted,

/s/ Lawrence Walker

Lawrence Walker
AR Bar No. 2012042
John W. Walker, P.A.
1723 Broadway
Little Rock, AR  72206
Tel: (501) 374-3758
Facsimile: (501) 374-4187
lwalker@jwwlawfirm.com

MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL
FUND

Griselda Vega Samuel
IL State Bar No. 6284538
Francisco Fernandez del Castillo
NY State Bar No. 977575
Susana Sandoval Vargas
IL State Bar No. 6333298
11 E. Adams, Suite 700
Chicago, IL 60603
Phone: (312) 427-0701
Facsimile: (312) 427-0691
Email: gvegasamuel@maldef.org
Email: ffernandez-delcastillo@maldef.org
Email: ssandovalvargas@maldef.org

Nina Perales
TX State Bar No. 24005046
110 Broadway, Suite 300
San Antonio, Texas 78205
Phone: (210) 224-5476
Facsimile: (210) 224-5382
Email: nperales@maldef.org


ATTORNEYS FOR PLAINTIFFS

17

## **CERTIFICATE OF SERVICE**

I hereby certify that, on September 22, 2021, a copy of the above Plaintiff's Brief in support of their Motion for Summary Judgement was filed electronically in compliance with Local Rules.

/s/ *Susana Sandoval Vargas*
Susana Sandoval Vargas
ATTORNEY FOR PLAINTIFFS